Charles **STEWART**, Plaintiff,

v.

Kenneth **McGINNIS**, Michael **O'Leary**, **Thomas Roth**, **Darrell Cobb**, **Theophilus Smith** and **Marie Jordan** in Their Official and Individual Capacities, Defendants.

No. 89 C 6115.

United States District Court, N.D. Illinois, E.D.

Aug. 4, 1992.

Chris Averkiou, Chicago, Ill., for plaintiff.

Diann K. Marsalek, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Charles Stewart ("Stewart") brings this 42 U.S.C. § 1983 ("Section 1983") action against various Illinois Department of Corrections ("IDOC") and Stateville Correctional Center ("Stateville") officials in both their individual and official capacities. Stewart asserts that he has suffered several constitutional violations during his incarceration at Stateville, and he seeks an award of damages plus declaratory and injunctive relief.

Each side has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated at length in this memorandum opinion and order, defendants' motion is granted and this action is dismissed.

### Rule 56 Principles

Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant—in this case (1) defendants as to Stewart's motion and (2) Stewart as to defendant's motion (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citations omitted)). Where as here cross motions are involved,

that principle thus demands a dual perspective—one that this Court has often described as Janus-like—that sometimes causes the denial of both motions.

In this instance, the task has been further complicated by both sides' failure to comply with this Court's General Rule ("GR") 12(m) and 12(n), which require factual statements in support of and in opposition to Rule 56 motions. Although each side has filed a GR 12(m) statement in support of its own motion,[1] neither side has tendered a GR 12(n) response. GR 12(n) provides:

> All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

Thus each side has effectively admitted the facts contained in the opponent's GR 12(m) statement (*Schulz v. Serfilco, Ltd.,* 965 F.2d 516, 518–19 (7th Cir.1992) is only one of a number of cases in which our Court of Appeals has recently enforced the rule with considerable stringency)—except to the extent that those facts are contradicted by the party's own GR 12(m) statement.

Yet even that relatively straightforward principle is complicated in this instance. First, defendants' GR 12(m) statement, which consists of a brief 15 paragraphs, fails to address most of the circumstances at issue in this litigation. And even worse, Stewart's comparatively long 196–paragraph GR 12(m) statement includes numerous assertions that either are not supported or are actually contradicted by the record, so it tends to obfuscate as much as to clarify the relevant facts. Even in the absence of a GR 12(n) response, Stewart cannot establish undisputed facts merely by asserting them in his GR 12(m) statement. Instead GR 12(m) requires that those statements be supported by "specific references to the affidavits, parts of the record, and other supporting materials."

After careful sorting, this opinion therefore derives its undisputed facts from each side's (mostly Stewart's) GR 12(m) statement, where those asserted facts are supported by record evidence identified there. In each instance where factual disputes exist (recognizable despite the absence of a GR 12(n) response, when Stewart's own GR 12(m) citations point to contradictory evidence), they are nonmaterial (that is, non-outcome-determinative (*Shlay v. Montgomery,* 802 F.2d 918, 920 (7th Cir.1986))).

### Parties

Stewart was incarcerated at Stateville between August 1987 and July 1991 (D. 12(m) ¶ 2), when he was transferred to Logan Correctional Center (Stewart Aff. ¶ 3). Stewart lived in Stateville's G Unit from July 1988 through the end of his Stateville stay (*id.* ¶ 2).

Kenneth McGinnis ("McGinnis") was the IDOC Director during the time period relevant to this litigation. Michael O'Leary ("O'Leary") was the Stateville Warden between 1983 and February 1990, when Thomas Roth ("Roth")[2] took over the post (Roth had been Assistant Warden during 1989). Darrell Cobb ("Cobb") was the Superintendent of G Unit during the entire period of Stewart's residence there. Theophilus Smith ("Smith") is a casework supervisor at Stateville and a member of the Stateville adjustment committee. Marie Jordan ("Jordan") is a correctional counselor at Stateville and also sits on the adjustment committee.[3]

---

1. Although defendants have mistakenly labeled their statement "12(L)," reflecting the GR's subparagraph designation before it was amended several years ago, the respective statements will properly be cited "P. 12(m) ¶ —" and "D. 12(m) ¶ —."

2. Roth gave a two-session deposition, one on October 17, 1991 and the second two weeks later on October 31. Because the two sessions were not numbered consecutively, the first will be cited "Roth Dep. I" and the second will be cited "Roth Dep. II."

3. Except where otherwise indicated, this opinion assumes that the identified defendants still hold the listed positions. There were also three other defendants originally included in Stewart's charges. Two of them, Robert Jockisch and Cot Harvey, were dismissed on Stewart's own motion pursuant to this Court's December 5, 1990 order. As for the third, Stateville grievance committee member Melvin Allen, although

## Standing

■ Although defendants have not raised the issue, Stewart's standing to seek injunctive and declaratory relief must be established before the substance of those claims may be addressed. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) has held that to satisfy the Article III case or controversy requirement a Section 1983 plaintiff seeking injunctive relief must be able to establish a personal stake in the outcome of his or her claim by showing a "real or immediate threat that the plaintiff will be wronged again" (*id.* at 111, 103 S.Ct. at 1669). Citing *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974) (a case involving discriminatory enforcement of the criminal law), *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 explained:

> Although it was claimed in that case that particular members of the plaintiff class had actually suffered from the alleged unconstitutional practices, we observed that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." Past wrongs were evidence bearing in "whether there is a real and immediate threat of repeated injury." But the prospect of future injury rested "on the likelihood that [plaintiffs] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond

proceedings, trial, or sentencing before petitioners."

And *Robinson v. City of Chicago,* 868 F.2d 959, 966–67 (7th Cir.1989) has held that the *Lyons* rule applies to declaratory as well as to injunctive relief.

Because Stewart was transferred out of Stateville in July, 1991, he is clearly under no threat of repeated injury. Thus he has no stake in the outcome of his declaratory and injunctive claims, and he therefore lacks standing to pursue them. Defendants' motion for summary judgment on those claims is therefore granted, and the rest of this opinion deals only with Stewart's claims for damages.[4]

## Deprivation of Property (Count I)

■ Stewart's first claim involves property removed from his cell during two "shakedown" searches. Such searches of inmate cells are conducted periodically and without advance notice. Inmates are removed from their cells while officers search for and remove contraband and unauthorized property. At Stateville confiscated property is supposed to be tagged and sent to a property storage room, and inmates are supposed to receive a "shakedown slip" listing all property taken from their cells (Cobb Dep. 12–13, 26–28). Then 20 Ill.Admin.Code § 501.230[5] deals with the later disposition of that property:

> c) If it is determined that unauthorized or excess property confiscated as contra-

---

the docket reflects no such dismissal, Stewart's GR 12(m) statement does not even mention him as a party, nor does it refer to him in any substantive sense—and Stewart's 86–page (!) brief is equally silent as to Allen. When defendants' responsive brief then joined Allen with other defendants as lacking personal involvement (Mem. 11) and as entitled to qualified immunity (Mem. 12–14), Stewart's R.Mem. 5 said nothing to suggest any discrete claim against Allen. Thus he too is entitled to the current dismissal.

4.  Defendants seek to escape from damages liability as well by invoking the doctrine of qualified immunity. That argument need not be addressed because none of Stewart's claims has been successful in any event. Although *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) speaks in terms of

resolving "many insubstantial claims on summary judgment" even before discovery is allowed, where as here the issues are fact-intensive that kind of threshold disposition is inappropriate (*Hunafa v. Murphy,* 907 F.2d 46, 49 (7th Cir.1990); see *Stauffacher v. Bennett,* 969 F.2d 1547, 1553 (7th Cir.1992) and cases cited there). And where a complete examination of the merits has taken place after the evidentiary record has been fully developed and tendered for summary judgment, with the defendants prevailing all down the line, no useful purpose is served by analyzing the issues in qualified immunity terms as well (after all, if a plaintiff has no valid substantive claim, it follows a fortiori that he had no "clearly established" constitutional right when the defendants acted).

5.  Further citations to that Code will take the form "Section—."

band, other than property specified in subsections (a) and (b) of this Section, belongs to the committed person, the committed person may, within 30 days of notice of confiscation:

1) Have the property shipped at his own expense or have it picked up at the facility during certain hours by a person designated in writing.

2) Request in writing that the property be destroyed.

3) Indicate, in writing, that he has filed a grievance regarding the confiscation of the property.

* * * * * *

e) Property which a committed person does not have shipped, picked up from the facility or destroyed within 30 days of notice of confiscation, or where the owner cannot be identified shall be sold, made [a] State loan, given to a charitable organization or destroyed, as determined by the Chief Administrative Officer. The Chief Administrative Officer may hold the property for an additional 30 days when it is not possible for the property to be picked up within 30 days of notice of confiscation. Any proceeds from the sale of confiscated property shall be deposited in the Inmate's Benefit Fund.

f) If a committed person grieves the confiscation of excess or unauthorized property within 30 days of the notice of confiscation, the property shall be retained at the facility until the grievance procedure has been completed.

Stewart claims that his due process rights were violated when that procedure was not followed after two shakedowns conducted on July 5, 1989 and May 24, 1990

(P. 12(m) ¶¶ I.32, I.36). Stewart asserts that on that first occasion a fan, a pair of blue jeans and legal papers belonging to him were removed from his cell (P. 12(m) ¶ I.33). However, the shakedown slip that was issued to Stewart and his cellmates on July 5 lists only the following items as having been removed: 4 mattresses, 25 sheets, 4 pillow cases, 1 wooden rod, 3 pillows, 3 desks, 1 roll cart, 1 "letter telling about drugs" and 1 Panasonic 10″ fan (P.Ex. I(1)). On July 8 a disciplinary report listing those same items and charging Stewart with possession of unauthorized property was issued (D. 12(m) ¶ 12; D.Ex. A–2; P.Ex. IV(9)).[6] Although Stewart states that he received no hearing following that shakedown (Stewart Aff. ¶ 9), both Stewart and defendants have provided an "adjustment committee summary" describing a disciplinary hearing held on July 12 as to the unauthorized property found in Stewart's cell (D. 12(m) ¶ 13; D. Ex. A–3; P.Ex. IV(5)).[7] That summary indicates that Stewart testified and was found guilty of maintaining unauthorized property. As for the final disposition of Stewart's property, the shakedown slip indicates that the items were "broken-junk" and were "disposed" on August 11, 1989 (P.Ex. I(1)).[8] Thus the fate of Stewart's claimed blue jeans and legal papers, never officially noted as having been removed from his cell, is unknown.

As for the May 24, 1990 shakedown, Stewart asserts that a pair of blue jeans, a fingernail clipper, tweezers, a pair of shoes and a jogging suit were removed from his cell and that he never received a shakedown slip or a hearing regarding their confiscation. Stewart assumes that those items were also destroyed, but he points to no evidence supporting that contention (P.

---

6. All items other than the letter, the fan and the cart were crossed out on the shakedown slip that was provided to this Court. Although the meaning of those markings is unclear, the repetition of those items on the disciplinary report suggests that their being crossed out does not indicate that they were mistakenly listed.

7. Stewart included that exhibit in support of his later claim regarding the inadequacy of the Stateville disciplinary process.

8. Again some confusion is created by the fact that all items other than the fan, the letter and the roll cart are crossed out on the shakedown slip. That confusion is not relevant here, however, as among the items listed the fan is the only item about which Stewart complains. Be-

12(m) ¶¶ 36–38).[9]

Stewart's procedural due process claim poses two different analytical problems. That stems from the different handling (or lack of handling) of the property involved.

First, unlike the other assertedly confiscated property, Stewart's fan was removed and later handled according to IDOC's standard procedure. Stewart received a shakedown slip documenting its removal on July 5 and a disciplinary ticket on July 8 indicating that the fan was unauthorized property. Then the fan was retained in accordance with the Section 501.230(e) 30–day requirement and was destroyed on August 11 as authorized by that section. During that 30 day period Stewart had an opportunity to initiate a grievance procedure (Section 501.230(f)), but he did not do so. Stewart therefore received notice and had an opportunity to be heard before the fan was destroyed.[10] Plainly his procedural due process rights were not violated by defendants' handling of his fan.

As for the remainder of his allegedly confiscated property (confiscation is assumed for purposes of defendants' Rule 56 motion), Stewart received no notice of its removal, received no hearing to determine whether it was unauthorized or contraband and had no opportunity to initiate a grievance procedure. All he knows is that the property disappeared from his cell on the day of the searches and that it was never returned to him. Nonetheless, Stewart's due process claim again fails.

*Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), which found no due process violation under essentially identical circumstances, necessarily controls here. Like Stewart, Palmer claimed that he was deprived of property without due process when some of his personal belongings were destroyed during a shakedown of his cell. *Hudson* extended

the Court's earlier holding in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which had then held that the *negligent* loss of property by prison employees does not violate the Due Process Clause as long as adequate postdeprivation remedies are available.[11] *Parratt, id.* at 539, 101 S.Ct. at 1915 had explained:

> [E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.

*Parratt, id.* at 541, 101 S.Ct. at 1916 found that a predeprivation hearing was not possible for the negligent loss of property because even though suffered "under color of law," the loss was unpredictable and beyond the state's control:

> In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under "color of law," is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation.

*Hudson,* 468 U.S. at 532–33, 104 S.Ct. at 3203 reasoned that the "practicability" of predeprivation procedures was not affected by whether or not the employee's action was intentional. Instead the relevant distinction was whether the deprivation resulted from "conduct pursuant to established state procedure" or whether it was rather

---

cause the fan was not crossed out, it was apparently among the items disposed of on August 11.

**9.** Stewart cites the Cobb and Roth II depositions in purported support of his contentions, but those references contain no such statements.

**10.** There is no indication in the summary of the July 12 disciplinary hearing that the fan was discussed there.

**11.** Since then *Parratt* has been overridden by the total exclusion of negligent conduct causing unintended losses from the reach of the Due Process Clause (see n. 19).

"effected through random and unauthorized conduct of a state employee" (*id.*). Only in the former situation was the deprivation foreseeable so that the State could be expected to provide predeprivation process.[12] *Hudson, id.* at 533, 104 S.Ct. at 3203 thus concluded that *Parratt* applied with equal force to all "random and unauthorized" employee conduct, whether that conduct was negligent or intentional:

> Accordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Hudson, id.* at 534, 104 S.Ct. at 3204 also held that whether the individual state agent may have known of the deprivation in advance was irrelevant, because "[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process." [13]

Stewart says that his case is distinguishable from *Hudson* because of the fact that shakedown searches, conducted at Stateville on a regular basis pursuant to established procedures, are authorized and predictable (P. Mem. 3). But that is of course irrelevant. Such searches, conducted elsewhere as they were at Stateville without notice and without inmates being present, have been held not to violate either the Fourth Amendment [14] or the Due Process

Clause as such because of the role played by the shakedown process in maintaining prison security (*Hudson,* 468 U.S. at 522–30, 104 S.Ct. at 3198–3202; *Block v. Rutherford,* 468 U.S. 576, 589–91, 104 S.Ct. 3227, 3234–35, 82 L.Ed.2d 438 (1984); *Bell v. Wolfish,* 441 U.S. 520, 555–57, 560–61, 99 S.Ct. 1861, 1882–83, 1885, 60 L.Ed.2d 447 (1979)). What Stewart must instead assert as the potentially actionable deprivation is the destruction of his property following such searches without his being afforded either notice or a hearing. And so the relevant question here as in *Hudson* is whether that *destruction* of Stewart's property was "random and unauthorized" or was "pursuant to an established state procedure."

Stewart has failed, even with all reasonable inferences in his favor, to raise a question of fact on that issue. His apparent attempt to do so is found in P. 12(m) ¶ 19:

> At times, property is disposed of in the garbage or destroyed by the property officer conducting the shakedown search.

But that statement, which may or may not be sufficient to raise a question about the predictability of property destruction, is not supported by any record evidence. Instead P. 12(m) ¶ I.19 points to two sources, neither of which contains the asserted fact:

> 1. Stewart refers to Roth Dep. I without citing any particular page, but that deposition makes no reference to disposal of property (with the exception of a question about disposal that went unanswered at page 53).
>
> 2. Stewart cites Log Report G–Unit, 7/5/89, 7–3 shift, 4:00 p.m., but that too

---

**12.** *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 435–36, 102 S.Ct. 1148, 1157–58, 71 L.Ed.2d 265 (1982) had previously held postdeprivation remedies inadequate where the deprivation is caused by an established state procedure.

**13.** This opinion need not consider the Court's later development of the *Parratt–Hudson* rule in *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Because of the total factual parallel between this case and *Hudson,* it is distinguishable from *Zinermon* in the same way as *Hudson* (see *Zinermon,* 494 U.S. at 136–39, 110 S.Ct. at 989–90).

**14.** It is of course anomalous to speak of the Fourth Amendment (or any other provision of the Bill of Rights) where state actors are charged with constitutional violations, for in every instance the plaintiff's rights are derived by definition from the Fourteenth Amendment's Due Process Clause. But wherever the operative legal standard is drawn from the Bill of Rights, incorporated by reference through the Fourteenth Amendment, this opinion follows the universal practice of referring directly to the underlying Bill of Rights provision.

makes no reference to disposal of property.

Thus Stewart has provided no evidence whatever that destruction of inmate property without notice or a hearing was a part of Stateville's established shakedown procedures. In *Hudson* terms it is uncontroverted that the claimed destruction of Stewart's property was "random and unauthorized." Stewart's due process rights were therefore not violated as long as adequate postdeprivation remedies were available.

On that score Stewart concedes that a state law tort remedy is available against state actors via the Illinois Court of Claims.[15] Instead his P. Mem. 11–12 argues that any such remedy is inadequate (1) because his loss, especially of legal papers, may be irremediable, (2) because he lacks the legal expertise to pursue a tort claim and (3) because he may confront problems of proof. But as *Hudson*, 468 U.S. at 535, 104 S.Ct. at 3204 has made clear as to comparable claims, problems that are "as much so under § 1983 as [they] would be under any other remedy" do not render a state remedy inadequate.

No material facts are in issue as to Count I. It is dismissed with prejudice.

### Segregation (Count II)

Stewart also claims that his procedural due process rights were violated when he was placed in disciplinary segregation for ten days in 1990 without receiving notice or a hearing. He seeks damages for that deprivation from both Cobb and Roth.

P. 12(m) ¶¶ II.1–19 and its supporting documents provide the relevant scenario. On May 24, 1990 (the day of the second shakedown) Cobb ordered that Stewart be removed from G Unit and placed in segregation Unit I pursuant to these events, described at Cobb Dep. 33–34:

Because he was up in my face hollering, swearing, telling me that I had no authority to conduct this lockdown ... [H]e demanded that I have the officers that searched his cell come back and place his property in the position that he desired to have it. I told Mr. Stewart that request was denied, that I was at the time talking to another inmate, that he was to go back to his room and leave me alone. He continued. I said, "Mr. Stewart, if you continue, I will have you removed." He continued. I had him removed, wrote a ticket, and Lieutenant Bagley escorted him with his property over to Unit I, and that was on May 24, 1990.

Stewart remained in segregation until about June 2 (P. 12(m) ¶ II.2). Although Cobb testified that he "wrote the ticket, placed the walk slip on it, and put it with the rest of the paperwork that was on the sergeant's desk that was to be turned in to the Adjustment Committee" (Cobb Dep. 34), Stewart says that he did not receive either written notice of the charges against him or a hearing on those charges (Stewart Aff. ¶¶ 32–33). Cobb admits that the ticket was misplaced and states that he does not know whether or not Stewart received a copy of the ticket (Cobb Dep. 34–35). Defendants do not dispute Stewart's assertion that he did not receive a hearing.

This time Stewart has successfully established a potential violation of his Fourteenth Amendment rights.[16] Just last year *Gilbert v. Frazier*, 931 F.2d 1581, 1582 (7th Cir.1991) held that the IDOC regulations governing inmate discipline create a protectable liberty interest by setting out a definite standard that must be met before an inmate can be punished with segregation. Relying on *Hewitt v. Helms*, 459 U.S. 460, 469–72, 103 S.Ct. 864, 870–71, 74 L.Ed.2d 675 (1983), *Gilbert*, 931 F.2d at 1582 explained:

> action would lie against a private person or corporation in a civil suit.

**15.** Ill.Rev.Stat. ch. 37, ¶ 439.8 confers this jurisdiction on the Court of Claims:

> The court shall have exclusive jurisdiction to hear and determine the following matters:
>
> \* \* \* \* \* \*
>
> (d) All claims against the State for damages in cases sounding in tort, if a like cause of

**16.** See n. 19.

A statute, regulation, or other legislative-type enactment that establishes a definite standard to guide the decision whether to (further) restrain a prisoner's freedom of action, rather than confiding the decision to the discretion of the administering authorities, is deemed to create a constitutionally enforceable entitlement to be free from that restraint unless the standard is applied to the prisoner in accordance with procedures that satisfy the requirements of due process of law.

*Gilbert, id.* held that Sections 504.10 to .150 have done just that. Those regulations and the corresponding Section 504 Table A set out a list of offenses and maximum penalties, including segregation, and require that prison authorities find an inmate guilty of a listed offense before imposing the prescribed punishment. Those listed offenses include "insolence," which is defined as "[t]alking, touching, gesturing or other behavior which harasses, annoys or shows disrespect" and is punishable by up to 15 days in segregation (Section 504 Table A, # 304), and which would presumably have been the charge against Stewart according to Cobb's account of the offense.

Although *Gilbert* recognizes that such a relatively slight deprivation requires only correspondingly slight procedural protections, those protections include the right to a hearing before the punishment of segregation is imposed. Because it is undisputed that Stewart did not receive a hearing either before or after being placed in segregation, Stewart's due process rights were potentially violated.[17]

But Stewart's claim must still fail because of his failure to establish a sufficient causal link between either Roth or Cobb and the claimed deprivation. Although different legal principles lead to that conclusion as to those two defendants, the end result is the same.

As for Roth, Stewart has provided no facts whatever to establish his knowledge of or his involvement in the events surrounding Stewart's placement in segregation.[18] As *Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986) (citations omitted, emphasis in original) has explained:

This court [has] stressed that "[s]ection 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." "Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official. A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." In short, "[i]ndividual liability for damages under section 1983 is predicated upon personal responsibility."

Stewart's claim against Cobb fares no better, even with all reasonable inferences drawn in Stewart's favor. According to the undisputed facts, Cobb's responsibility for insuring that Stewart received notice and a hearing ended after he wrote the ticket and sent it on its way to the adjustment committee (Cobb Dep. 34–35):

I just gave it to the—put it with the rest of the tickets. The tickets were to be turned in. I don't follow up tickets. No one has to follow up tickets. Once you write it, you submit it onto the Adjustment Committee. Then it's to be served by the investigator of the Adjustment Committee, and it's taken over and served.

So Stewart has demonstrated that Cobb was at worst negligent in misplacing the ticket or remiss for failing to double check

---

17. Because of Cobb's testimony that he issued a disciplinary ticket to Stewart, it is beyond question that the segregation was disciplinary and not administrative—the other option discussed in *Gilbert,* which may or may not have triggered the same due process protections.

18. Cobb Dep. 39 states:

Q: In this particular instance did you notify the warden?
A: No, sir, I didn't notify—I notified the people that I just told you. It's not standard procedure for the warden to be notified every time an inmate is walked [to segregation] if that's what you're asking me.

that the adjustment committee had done its job. And it is no longer true, as it may have been under *Parratt*, that a showing of mere negligence can suffice to establish Section 1983 liability (*Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986)).[19] Instead, *Rascon*, 803 F.2d at 274 teaches:

> [T]o establish a claim against a supervisory official, there must be a showing that the official knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or failure to act.

Stewart has therefore failed to state a claim against either Roth or Cobb. Defendants' motion for summary judgment is also granted on Count II.

### Lockdowns (Count III)

■ Between July 1 and October 2, 1989 Stateville was placed on "lockdown" after a correctional officer was killed (P. 12(m) ¶ III.21; D. 12(m) ¶ 14). Between May 20 and June 5, 1990 another lockdown was implemented after two inmates were killed (P. 12(m) ¶ III.22; D. 12(m) ¶ 15). Stewart claims that the imposition of those lockdowns without notice or a hearing violated his procedural due process rights. He also contends that the conditions of the lockdowns constituted cruel and unusual punishment, that the restrictions impermissibly burdened his right to free exercise of religion and his right of access to the courts, and that he was impermissibly denied access to general reading material and commissary. What follows will deal with those claims and the relevant facts bearing on each of them in turn.[20]

Due Process

*Hewitt*, 459 U.S. at 466, 103 S.Ct. at 868 identifies the two potential bases from which Stewart may derive procedural due process rights:

> Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States.

Neither of those sources affords him relief under the facts of this case, however.

First, *Caldwell v. Miller*, 790 F.2d 589, 604–05 (7th Cir.1986), has established that the first of those sources is simply not implicated by the imposition of lockdown restrictions. Quoting *Vitek v. Jones*, 445 U.S. 480, 492, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980), *Caldwell* there held that regardless of the severity or duration of lockdown restrictions, inmates' procedural due process rights are not violated because the change in conditions does not constitute an additional punishment:

> The Court reaffirmed, nonetheless, that "[i]t is also true that changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause." Under the guidelines set forth by the Supreme Court, we must look to the nature, not the weight of a claimed deprivation. The difference between the pre- and post-lockdown conditions at Marion is one of degree and not of kind. Even assuming that the lockdown restrictions are permanent, it cannot be said that they brought about conditions of confinement that are qualitatively different from the punishment characteristically suffered by a convict. These conditions

**19.** *Daniels* (emphasis in original) actually put it in these terms:

> We conclude that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.

Under that holding, Stewart has not only failed to state a claim against Cobb but has failed even to establish that a due process deprivation took place. Because the facts surrounding the loss of the ticket are largely missing, it is unclear whether *someone* may have been more than negligent in failing to provide Stewart with a

hearing. But that line of inquiry need not be pursued, for whether or not Stewart's due process rights may have been implicated by *someone's* action, he has clearly failed to link Cobb to such a possible deprivation.

**20.** Stewart's Complaint also refers to a 90–day lockdown beginning on January 31, 1990 and a 14–day lockdown initiated on August 13, 1990. Because Stewart's motion for summary judgment and its supporting documents do not advert to those incidents, they need not be discussed here—they drop out of the case.

in no way constitute an additional punishment.... As such, the continuation of the lockdown restrictions does not implicate a protected liberty interest, and is hence not subject to judicial review under the Due Process Clause.

*Smith v. Shettle*, 946 F.2d 1250, 1252 (7th Cir.1991) has since then reaffirmed *Caldwell*'s holding:

Subject only to such restraints as the cruel and unusual punishments clause of the Eighth Amendment may place upon the severity of punishment, a state can confine a prisoner as closely as it wants, in solitary confinement if it wants; a prisoner has no natural liberty to mingle with the general prison population.... Only if the state decides to recognize such a liberty—a liberty that is artificial, therefore, rather than natural—does he have a right that he can enforce under the due process clause of the Fourteenth Amendment.

In sum, Stewart has no constitutionally-based liberty interest in non-lockdown conditions that entitles him to due process protections before a lockdown is imposed.

Stewart also argues that he has a state-created entitlement conferred by IDOC regulations. He points in particular to Section 501.120, entitled "Response to Serious Institutional Disturbances":

a) The Chief Administrative Officer may confine committed persons temporarily in all or part of the facility when determined necessary in order to maintain security of the facility or the safety of committed persons, employees or other persons.

b) The decision to impose a lockdown shall be reviewed and approved by the Director, whenever possible, prior to the imposition of the lockdown, but in any event, promptly thereafter.

c) Continuation of the lockdown shall be reviewed every 10 days by the Chief Administrative Officer and the Director.

Stewart relies on the holding in *Smith*, 946 F.2d at 1252 that Ind.Code § 11–10–1–7(a)—permitting administrative segregation of an inmate only after a finding "that segregation is necessary for the offender's own safety or the safety of others"—conferred on inmates an entitlement not to be segregated in the absence of such a finding. Stewart argues that because Section 501.120(a), like the Indiana regulation, sets forth criteria that are "binding," "exhaustive" and "definite," it also creates a protectable liberty interest.

But whether or not Section 501.120(a) satisfies those *Smith* conditions, it does not confer on Stewart a right to individualized notice and a hearing before the imposition of lockdown restrictions. Unlike the Indiana regulation, Section 501.120 does not deal with restrictions on an individual inmate, but with a decision that affects the institution as a whole. It is settled that "the due process clause does not require individual hearings before a governmental body takes decisions that affect the interests of persons in the aggregate" (*Dawson v. Milwaukee Hous. Auth.*, 930 F.2d 1283, 1286 (7th Cir.1991), citing *Atkins v. Parker*, 472 U.S. 115, 129–31, 105 S.Ct. 2520, 2528–30, 86 L.Ed.2d 81 (1985) and *Bi–Metallic Invest. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915)). Because "[w]here a rule of conduct applies to more than a few people, it is impractical that everyone would have a direct voice in its adoption" (*Bi–Metallic, id.*), Stewart was not entitled to individualized process before the imposition of lockdown restrictions that affected all of Stateville's more than 2000 inmates (Cobb Dep. 57).

Thus neither potential source of procedural due process rights affords Stewart relief. No claim arising under the Due Process Clause taints either of the two lockdowns.

### Cruel and Unusual Punishment

■ Focusing on the 94–day 1989 lockdown, Stewart claims that the conditions imposed violated his Eighth Amendment right to be free from cruel and unusual punishment.[21] He claims that he was con-

---

**21.** As for this and the remaining claimed constitutional violations relating to the lockdowns,

Stewart speaks in his motion for summary judg-

fined to his cell for 24 hours a day, was denied contact with inmates other than those who shared his cell, had no opportunity for outdoor exercise and was not provided with regular access to showers.[22]

But those allegations turn out to be wholly at odds with the facts, even with all reasonable inferences in Stewart's favor. Because the issue is thus one of failure of proof rather than based on legal principles alone, the several claims will be dealt with separately.

### 1. *Conditions of Confinement*

In support of his assertion that he was confined to his cell for 24 hours a day and was denied contact with all inmates other than his cellmates (P. 12(m) ¶¶ III.3–4), Stewart cites various portions of the depositions of Cobb (Dep. 41, 45–46), Roth II (Dep. 22, 42) and O'Leary (Dep. 37). However, all those cited pages contain only generalized descriptions of Stateville lockdown procedures. Stewart's G Unit presented a dramatically different picture, as portrayed in the only record testimony on *that* subject (Cobb Dep. 54–55):

In G Dorm it doesn't make too much difference. The inmates doors cannot be locked, so the inmates really have the run of the wing and the day room. We tell them that they're not to take showers on days that they're not to. We catch them in there taking showers. We tell them they're not to be in the day room. They will walk out of their room and go in the day room. You know, what can you say? The door isn't locked, you know, so we try not to make a big deal out of it unless it becomes a problem.

If a man is caught in the shower, we tell him to get out. If he refuses to come out then or he wants to give us a whole bunch of problems about coming out, then we give him a ticket for taking a shower. If he comes on out, we send

him back to his cell. We try to be realistic. If I can't lock you in your cell, in your room like I can in the regular cell house, then why would I—I don't expect you not to walk out. That's expected behavior. They are inmates. I expect them to come out into the wing. I expect them to go into the day room. I expect them to go jump in the shower, and if we catch you in there, then you get caught. If we don't then you get away with a shower.

Similarly, although the rules forbade it G Unit inmates were also apparently able to visit other cells during the lockdown (*id.* at 55–56). And just as in non-lockdown circumstances, they were free at any time to use the toilets and wash basins located at the end of the wing (*id.* at 47, 62–63).

Stewart has provided no evidence to contradict Cobb's description. That spells defeat on his claim that he, as an inmate in G Unit, was confined to his cell 24 hours a day and was denied contact with other inmates during the lockdown.

### 2. *Outdoor Exercise*

Both Cobb and O'Leary have testified that inmates in G Unit, like the other Stateville inmates, were denied an opportunity for outdoor exercise during the 1989 lockdown (Cobb. Dep. 45; O'Leary Dep. 53). In confirmation of that testimony, the G Unit log reports reflect that inmates were first allowed out to the yard on September 25, some 85 days after the lockdown was instituted on July 1 (P.Ex. III(2) at 155–66).

*French v. Owens*, 777 F.2d 1250, 1255 (7th Cir.1985) has held:

Lack of exercise may certainly rise to a constitutional violation. Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised.

ment and its supporting documents only of that June to October 1989 lockdown.

**22.** Stewart's Complaint also alleges unsanitary food distribution, unclean cells, infestation with vermin and roaches, and inadequate medical

care during the lockdowns. But again, because Stewart has not pursued those allegations in his motion for summary judgment and its supporting documents, they have failed for want of proof and are dismissed.

But the later application of that principle to factual situations that are legally indistinguishable from Stewart's defeats his claim. Thus *Caldwell*, 790 F.2d at 600–01 held that when for a period of seven months inmates at Marion were confined to their cells for 23 hours a day and were provided with only one hour of indoor exercise daily, their Eighth Amendment rights were not violated. And though *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir.1988) involved a lesser period than that of the Stateville lockdown,[23] its explanation of the absence of an Eighth Amendment violation applies equally to Stewart:

> Lack of exercise is easily distinguishable from deliberate denial of medical care. Unless extreme and prolonged, lack of exercise is not equivalent to a medically threatening situation.

And to return to a length of time more like that involved here, *Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir.1988) (per curiam) similarly held that when an inmate who posed an escape risk was denied outdoor exercise for almost four months, his Eighth Amendment rights were not violated because he had ample space for exercise in his cell and "the limitation on his access to the outdoors is related to a legitimate prison concern" (something equally true of the lockdown here).[24]

Lack of recreational opportunities may also rise to the level of cruel and unusual punishment for reasons other than their effect on physical health when they exist in concert with other severe restrictions. As *Wilson v. Seiter*, —— U.S. ——, ——, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991) (emphasis in original) has explained:[25]

> *Some* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable

human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets. Compare *Spain v. Procunier*, 600 F.2d 189, 199 (CA9 1979) (outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day) with *Clay v. Miller*, 626 F.2d 345, 347 (CA4 1980) (outdoor exercise not required when prisoners otherwise had access to day room 18 hours per day).

In addition to purely physical health concerns, then, denial of out-of-cell exercise or recreation has also been considered constitutionally significant for psychological reasons when inmates are otherwise unable to move about or have human contact. Thus *Davenport v. DeRobertis*, 844 F.2d 1310, 1314–15 (7th Cir.1988), a case also involving conditions at Stateville, held that it was not clearly erroneous for a district judge to have held that inmates confined in segregation for more than 90 days should receive a minimum of five hours of out-of-cell exercise per week. That decision, explicitly not based on physical fitness concerns, rested on the fact that the inmates were otherwise in solitary confinement and had no opportunity for movement or human contact.

But once again those doctrines do not assist Stewart, given Cobb's unrefuted testimony that inmates in G Unit were able during the lockdown to leave their cells, to use the day room, to visit other cells and to go to the bathroom at any time. Because such inmates had the opportunity to exercise within their cells (Cobb Dep. 45) and were able to move about the unit, they were not at risk of the negative health effects discussed in *French*. And because Stewart and his fellow G Unit prisoners had cellmates and the opportunity to visit with other inmates outside of their cells, he and they did not suffer the psychological effects of isolation discussed in *Davenport*. Once more Stewart did not suffer cruel and unusual punishment.

---

**23.** In that case an inmate in segregation went without exercise for 28 days but was allowed to move about within the segregation unit.

**24.** *Martin* does not indicate the extent to which Martin was able to move about outside of his cell.

**25.** See also *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir.1983) ("challenged conditions must be viewed in the light of other prison conditions that may aggravate or mitigate the effect of the challenged conditions").

### 3. *Showers*

*Davenport,* 844 F.2d at 1316 has held that one shower per week "is constitutionally sufficient" for inmates in Eighth Amendment terms. Stewart has failed to establish that his access to showers fell below that level. First of all, although Stewart's Complaint ¶ III.24 alleges that he was actually forbidden to shower during the entire 94–day lockdown, he has again failed to provide evidence in support of *that* allegation.

What evidence Stewart does provide as to showers does not do the job either. While his GR 12(m) ¶ III.29 states that "[d]uring lockdowns prisoners are allowed one shower per week" (for that he cites Cobb Dep. 41, which makes the same assertion [26]), his GR 12(m) ¶ III.79 states that "[s]howers are restricted to less than one shower per week." That statement is based on entries in the G Unit daily log showing that showers were provided during only one shift once a week, and that each time only about half of the inmates showered while the others "refused" (see, e.g., P.Ex. III(2) at 29, 57, 89, 96).[27] Although Cobb testified that two shifts were necessary to enable all 200 G Unit inmates to shower if they chose to, no deprivation of constitutional rights can be teased out of a situation in which the absence of a weekly shower stems from an inmate's refusal to take one when offered. Indeed, Stewart has provided no evidence at all about how often he himself was able to shower. This final aspect of his Eighth Amendment claim must fail as well.

### Other Constitutional Claims

### 1. *Group Religious Services*

■ During the 94–day lockdown all group religious services were cancelled, although chaplains were available to visit with inmates on an individual basis (Cobb Dep. 46). Stewart contends that the ban on communal worship violated his First Amendment right to free exercise of religion.

Decided just one week after *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) had announced standards for testing prison restrictions on inmates' rights,[28] *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) applied those standards in the free-exercise-of-religion context. *O'Lone* upheld a prison regulation that prohibited inmates from attending certain group religious services, after having determined via the four *Turner* factors that the regulation was reasonably related to valid penological objectives. Since that time our Court of Appeals has had several occasions to apply that line of analysis, sometimes upholding and sometimes invalidating prison policies that impacted free exercise rights (see, e.g., *Richards v. White,* 957 F.2d 471, 474–75 (7th Cir.1992); *Siddigi v. Leak,* 880 F.2d 904, 908–10 (7th Cir.1989); *Williams v. Lane,* 851 F.2d 867, 877–78 (7th Cir.1988); *Hadi v. Horn,* 830 F.2d 779, 783–88 (7th Cir.1987)).

Although here defendants have failed to offer any reasons in support of the acknowledged ban, their motion must nonetheless be granted. Even if it were assumed (essentially by default) that the ban was unreasonable, Stewart has failed to state a claim for interference with *his own* free exercise rights. He has completely failed to demonstrate that he has any sincerely held religious beliefs or that the religion—if any—that he practices requires group religious expression. Consequently

---

**26.** P. 12(m) ¶III.29 also mysteriously cites O'Leary Dep. 39 and 44, but those pages say nothing about the frequency of showers.

**27.** Stewart contests the truthfulness of those entries, but he offers no evidence in support of his contention (P.Mem. 25).

**28.** *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261 gives prison administrators a great deal of leeway:

[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

It then sets out (*id.* at 89–91, 107 S.Ct. at 2261–63) four factors that bear on the "reasonableness" determination.

he has failed to establish that the 94–day ban on communal worship interfered in anyway with his own religious expression.

### 2. *Law Library Access*

■ Stewart claims that his right of access to the courts was violated when he was denied access to the Stateville law library during the 94–day lockdown (see *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977)). There is some conflict in the evidence as to the actual degree of law library access during the Stateville lockdowns, as reflected in Stewart's own GR 12(m) ¶ III.31 citations. Cobb testified that inmates had no access to the law library during the lockdowns and were able to use only those materials that were already in their cells (Cobb Dep. 44). On the other hand, O'Leary testified that during the lockdowns law librarians toured the various units and that if inmates had a court deadline they could "go right away to the law library and access the law library, or at least access law library material" (O'Leary Dep. 53–54).

But that factual uncertainty is nonmaterial in the legal sense, because Stewart has suggested no actual prejudice of any kind resulting from the restricted access or lack of access. *Shango v. Jurich,* 965 F.2d 289, 292 (7th Cir.1992), quoting *Hossman v. Spradlin,* 812 F.2d 1019, 1021–22 n. 2 (7th Cir.1987) (emphasis in *Shango*), has just reaffirmed the obvious proposition that a plaintiff must show injury to support such a claim:

> [O]ur case law makes it clear that even to survive a motion for summary judgment, the plaintiff must "allege some quantum of detriment caused by the challenged conduct of state officials *resulting in the interruption and/or delay of plaintiff's pending or contemplated litigation.*"

More specifically, to state a claim Stewart must present evidence of court dates missed, inability to make timely filings, denial of legal assistance to which he was entitled or loss of a case that he could otherwise have won (*Martin v. Davies,* 917 F.2d 336, 340 (7th Cir.1990); *Bruscino v. Carlson,* 854 F.2d 162, 167 (7th Cir.1988)).[29]

In summary, neither this Court nor an ultimate factfinder has to resolve which version accurately reflects the extent of Stewart's access or nonaccess to the prison library. Either way, the total absence of any indication of prejudice dooms his claim.

### 3. *Access to General Reading Materials*

During the lockdown inmates had no access to general library materials and were able to read only those materials that were already in their cells (Cobb. Dep. 44, O'Leary Dep. 54). Although his argument is less than completely clear, Stewart is apparently also contending that such a restriction violated his First Amendment rights.

■ While it is true that prisoners have a protectable First Amendment right to receive and to retain published materials (see, e.g., *Bell v. Wolfish,* 441 U.S. at 548–52, 99 S.Ct. at 1879–81; *Jackson v. Elrod,* 881 F.2d 441, 443–46 (7th Cir.1989)), that right does not create an affirmative duty on the State to *provide* reading materials to inmates. In this instance the policy was not a potentially unconstitutional content-based restriction, and it was not unevenly applied so as to create possible equal protection problems (see, e.g., *Williams,* 851 F.2d at 881–82). Nor does any authority establish that what Stewart complains of constitutes cruel and unusual punishment for Eighth Amendment purposes.

### 4. *Commissary Privileges*

■ Stewart also contends that his constitutional rights were violated when com-

---

**29.** This is to be contrasted with the situation in *DeMallory v. Cullen,* 855 F.2d 442, 448–449 (7th Cir.1988), where inmates "had *no* access to the library and faced other restrictions to legal assistance over a ten-year period" (*Martin,* 917 F.2d at 340 (emphasis in original)). Here the period involved, though it spanned some three

months, was directly responsive to the extraordinary security problems that caused the lockdown. *Shango* teaches that such legitimate security concerns place the burden on plaintiff to show some actual harm rather than the "inherent allegation of prejudice" found in the *DeMallory* situation (855 F.2d at 448–49).

missary privileges were suspended during the 94–day lockdown. That argument too fails as a matter of both fact and law.

First, in support of his factual assertion that "[p]risoners are not given access to commissary during the lockdowns" (P. 12(m) ¶ III.30, III.78), Stewart again cites to record evidence that does not support his contention. Instead those cited pages, which speak only of lockdown procedures in general, indicate that commissary is sometimes provided during lockdowns and that it is likely to have been provided at some point during an extended lockdown (Cobb Dep. 43, O'Leary Dep. 39).[30] In the record's only specific reference to the 1989 lockdown, O'Leary (at his Dep. 52, a page not cited by Stewart) testified that commissary was indeed provided during the latter part of that period.

Moreover, even if commissary privileges had been denied completely, Stewart would still have failed to make out a constitutional violation. As discussed in the next section of this opinion, Stewart has no constitutionally protected right to commissary access. Nor in a situation such as this, with Stateville providing all necessary personal hygiene items (Cobb Dep. 43), does denial of commissary privileges implicate Stewart's Eighth Amendment rights.

### Disciplinary Procedures (Count IV)

Stewart argues (P.Mem. 68) that his procedural due process rights were violated on several occasions when he did not receive an adequate written explanation for various disciplinary actions taken against him. Those actions include five instances in which Stewart received a "reprimand" and three occasions on which his commissary privileges were revoked for a period of two to four weeks. Apparently Stewart's argument rests on the due process requirements for prison disciplinary proceedings set forth in *Wolff v. McDonnell*, 418 U.S. 539, 563–72, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935 (1974), which include "a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action" (*id.* at 564, 94 S.Ct. at 2967, citation omitted).

But Stewart cannot invoke the *Wolff* requirements because he has not taken the first step in stating a procedural due process claim: the demonstration of interference with some protected liberty or property interest.[31] To expand a bit on the same point made earlier in this opinion, *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citations omitted) has put the matter in these terms:

> The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," and must be based on more than "a unilateral hope." Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Protected liberty interests "may arise from two sources—the Due Process Clause itself and the laws of the States."

Here Stewart has failed to offer any proof at all that the challenged disciplinary actions interfered with any such protected interest. First, any actions that resulted merely in a reprimand and thus amounted to no deprivation at all obviously did not affect any protected interest. And *Campbell v. Miller*, 787 F.2d 217, 222 (7th Cir. 1986) has held that no constitutionally-based liberty interest is implicated by the denial of commissary privileges, so that Stewart might have a protectable interest in his commissary privileges only if one is afforded by state law. Stewart has pointed to no regulation that might establish

---

**30.** Cobb Dep. 45–46, also cited by Stewart, makes no reference to commissary privileges.

**31.** *Wolff*, 418 U.S. at 572 n. 19, 94 S.Ct. at 2982 n. 19 itself stated:

> We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges.

See also *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976):

> We have rejected the notion that every state action carrying adverse consequences for prison inmates automatically activates a due process right.

such an entitlement to commissary privileges, nor has this Court's own brief search located any such regulation. Because no protected interest was therefore affected by the disciplinary actions, Stewart's due process rights were not infringed.

### Grievance Procedures (Count V)

Stewart's Count V contends that the Stateville grievance procedures are inadequate and asks this Court to enter an injunction requiring their reform. Defendants' motion for summary judgment is also granted on Count V because, as stated early in this opinion, Stewart lacks standing to seek injunctive relief.

### Conclusion

Because Stewart has no standing to pursue his proposed claims for injunctive and declaratory relief, defendants' motion for summary judgment is granted on those claims. Stewart has also failed to establish any constitutional violations that could entitle him to recover damages, for (1) any factual differences presented by the record are not material and (2) the law is against him. Defendants therefore are entitled to a judgment as a matter of law. This action is dismissed with prejudice.