In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-2103, 01-2286 & 01-2295

United States of America,

Plaintiff-Appellee,

v.

Joseph L. Tokash, Mitchell E. Kolb,
and John Derel Usher,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Illinois.
Nos. 99-CR-40045, 99-CR-40047, 99-CR-40049--
J. Phil Gilbert, Judge.

Argued December 5, 2001--Decided March 11, 2002

Before Coffey, Ripple, and Diane P. Wood,
Circuit Judges.

Coffey, Circuit Judge.  A systemwide search of inmates at the United States Penitentiary at Marion, Illinois, prompted by the May 18, 1999, racially motivated murder of an inmate, revealed that inmates Joseph Tokash, Mitchell Kolb, and John Derel Usher had concealed weapons in their rectal cavities. Tokash, Kolb, and Usher were charged with possessing weapons in a federal prison in violation of 18 U.S.C. sec. 1791(a)(2). The government filed similar pre-trial motions in limine to preclude each of the defendants, who were tried individually, from introducing evidence in support of a defense of necessity or other justification defenses at trial. The trial judge granted the government's motions, and juries convicted each of the three defendants. In this consolidated appeal, the individual defendants-appellants argue that the trial judge erred in prohibiting them from introducing the defense of necessity. We affirm.

I.  Factual Background

   On May 18, 1999, Terry Lamar Walker, a black inmate at USP-Marion, was stabbed

to death by two white inmates associated with the Dirty White Boys prison gang and its ally, the Aryan Brotherhood. Prison officials promptly took steps to secure the safety of its guards and inmates and conducted a thorough "shakedown" at the institution in an effort to locate additional weapons and weapon-making tools. During the shakedown USP-Marion officials employed the use of x-ray and digital examinations of individual inmates in an attempt to discover any internally concealed contraband.

On May 19, 1999, one day after the murder, x-ray and digital examinations revealed that five inmates had concealed weapons, steel or plastic knives, in their rectal cavities. Appellants Tokash and Kolb were two of those five inmates. One week later, on May 26, 1999, the same search methods uncovered a steel knife that appellant Usher had hidden in his rectal cavity. On June 9, 1999, a grand jury sitting in the Southern District of Illinois charged Tokash, Kolb, and Usher,/1 in separate indictments, with one count of possessing weapons in a federal prison contrary to 18 U.S.C. sec. 1791(a)(2). Prison officials later discovered each of the appellants with additional weapons and grand juries returned superseding indictments adding additional counts charging each of them with multiple violations of sec. 1791(a)(2), which punishes an inmate who "makes, possesses, or obtains, or attempts to make or obtain, a prohibited object," including any object that "threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual."/2 18 U.S.C. sec. 1791(a)(2) & (d).

In the three appellants' individual cases, the government filed a pre-trial motion in limine to preclude the defendant from introducing evidence in support of a defense of necessity or other justification defense at trial, unless he made a prima facie showing that he satisfied the legal requirements to raise such a defense. According to the government, the defendants could establish neither that they faced an imminent threat nor that they had availed themselves of all reasonable legal alternatives. The appellants, all white inmates, filed responses and offers of proof in which they complained about the

manner in which USP-Marion officials administered the prison, including prison officials' refusal to maintain racially segregated housing units, and about previous racially motivated incidents of violence at USP-Marion. Tokash further proffered that other inmates at USP-Marion would testify that "it was generally believed by inmates that appeals to the Prison Administration regarding threats made and dangerous persons would have been futile." The defendants further filed motions for subpoenas duces tecum in order to procure Bureau of Prisons documents that they speculated would help establish their theory that racial tension so permeated USP-Marion that they had no choice other than to violate the law by arming themselves. In addition, the defendants sought deposition testimony from other inmates in support of their allegations regarding the racially charged atmosphere at USP-Marion.

The trial judge, accepting the facts in the offers of proof as true, agreed with the government that the appellants alleged only a generalized fear of attack by some unknown or unspecified assailant at some unknown time in the future, and that such allegations were legally insufficient to support a necessity or other justification defense. The trial judge further noted that the appellants failed to avail themselves of available legal alternatives prior to arming themselves. Thus the trial judge granted the government's motions in limine to preclude evidence or argument regarding a necessity or other justification defense. After ruling in favor of the government on its motions in limine, the trial judge went on to deny the defendants' motions for depositions and subpoenas duces tecum, ruling that the information the defendants sought was not relevant because the defendants were precluded from introducing evidence regarding a necessity or duress defense.

In separate trials, juries convicted all three defendants on all counts, except that a jury failed to convict Kolb on the second count of unlawfully possessing a weapon in a federal prison arising from the knife found in his cell on October 5, 1999. The defendants-appellants appeal.

II.  Issues

Appellants contend that the trial judge committed error in granting the government's motions in limine, raising several arguments in support. Initially, the appellants argue that the trial judge erred in granting the motions in limine because a motion in limine was not the proper mechanism for the government to challenge the legal sufficiency of their proposed defenses and, as such, the court's order violated their rights to trial before a jury. Next, appellants argue that the trial judge erred in precluding them from advancing their necessity defenses at trial, contending both that the judge erred in requiring them to demonstrate that they faced an imminent threat and that, when taken as true, their offers of proof did demonstrate that they availed themselves of all reasonable legal alternatives prior to arming themselves. Finally, appellants contend that the trial court erred in preventing them from taking the depositions of other inmates regarding conditions at USP-Marion.

III. Analysis

A. Standards of Review

The legal sufficiency of a proffered defense is a question of law and therefore is reviewed de novo. United States v. Simmons, 215 F.3d 737, 740-41 (7th Cir. 2000); United States v. Santiago-Godinez, 12 F.3d 722, 726 (7th Cir. 1993). Generally, whether or not an affirmative defense is available to a defendant requires the resolution of factual issues, and thus, where a court rules on the availability of a pre-trial motion in limine, the trial court must accept as true the evidence proffered by the defendants. See Santiago-Godinez, 12 F.3d at 727. Nevertheless, where the evidence proffered in response to the motion in limine is insufficient as a matter of law to support the affirmative defense a pre-trial ruling precluding the presentation of the defense at trial is appropriate. Id. To entitle a defendant to present an affirmative defense to the jury, his proffer must meet the minimum standard as to each element of the defense, so that if a jury finds it to be true, it would support the defense. Id. In so doing, the defendant must present "more than a scintilla of evidence" that

demonstrates that he can satisfy the legal requirements for asserting the proposed defense. United States v. Blassingame, 197 F.3d 271, 279 (7th Cir. 1999).

We review a district court's pre-trial discovery rulings under an abuse of discretion standard. Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1998); United States v. Moore, 115, F.3d 1348, 1359 (7th Cir. 1997).

B.  Propriety of the Motions in Limine

Initially, the appellants argue that the trial judge's order granting the government's motions in limine were premature and effectively deprived the defendants of their Fifth and Sixth Amendment rights to due process and to have a jury of their peers determine their guilt beyond a reasonable doubt. According to the appellants, the jury ought to have heard their evidence regarding the racial tension at USP-Marion and decide for itself whether the defendants had satisfied all the elements of their proposed defense. Appellants argue that to remove such a determination from the purview of the jury violated their rights to jury trials. Appellants fail to cite even one case, from any jurisdiction or court, that adheres to the philosophy that a trial court's ruling on a motion in limine to preclude a defense trammels a defendant's constitutional rights. Instead, appellants seize upon language in a 1987 article from the Stanford Law Review to suggest that when a court grants a motion that precludes a defense "it jeopardizes an accused's constitutional rights . . . ." 39 Stan. L. Rev. 1271.

In our opinion the appellants' arguments are without merit and mistake the basic function of a jury. It is a basic premise of our legal system that juries are the triers of fact only; it is for the judge, not the jury, to interpret the law. See, e.g., McNair v. Coffey, No. 00-1139, 2002 WL 111362, *12 (7th Cir. January 29, 2002) (Coffey, J., concurring). In this instance, the trial judge accepted as true all of the statements made in the defendants' offers of proof, thus erasing any factual issues, and determined whether the defendants had proffered sufficient evidence as a matter of law to

support their proposed affirmative defense of necessity. See Blassingame, 197 F.3d at 279; Santiago-Godinez, 12 F.3d at 727. Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues. See United States v. Haynes, 143 F.3d 1089, 1090 (7th Cir. 1998); Blassingame, 197 F.3d at 279; United States v. Mauchlin, 670 F.2d 746, 748 (7th Cir. 1982). The Supreme Court has stated unequivocally that

[t]he requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses. If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.

United States v. Bailey, 444 U.S. 394, 416 (1979) (emphasis added).

"Were we to hold . . . that the jury should be subjected to this potpourri even though a critical element of the proffered defenses was concededly absent, we undoubtedly would convert every trial . . . into a hearing on the current state of the federal penal system." Id. at 417. "A judge may, and generally should, block the introduction of evidence supporting a proposed defense unless all of its elements can be established." Haynes, 143 F.3d at 1090. Thus, the trial judge did not err in ruling on the government's motions in limine, and, as we explain below, we hold that the judge's decisions to exclude any evidence or argument regarding the defenses of necessity or duress were proper.

C.  Merits of the Government's Motions in Limine

Appellants next argue that the trial judge erred in granting the government's motions in limine. The appellants desired to present evidence of the affirmative defense of necessity to the jury. In Bailey, the Supreme Court announced that a defendant was not entitled to claim a defense of necessity or duress unless he could demonstrate that "given the imminence of the threat, violation of [the law] was his only reasonable alternative." 444 U.S. at 411. Appellants contend that the trial judge erred in ruling that the test set forth in Bailey required them to demonstrate that they faced an imminent threat of death or serious bodily harm in order to advance a justification defense. Appellants further contend that, even if the Bailey Court required them to demonstrate imminence, the trial judge erred in ruling that the facts set forth in their offers of proof were insufficient to allow them to advance their proposed defense.

Appellants' initial claim, that the trial judge committed error in requiring them to demonstrate that they feared an imminent threat, urges us to adopt a rule stating that imminence is not an essential element of the lesser-evil defenses. According to appellants' theory, lesser-evil defenses should be available to defendants who can establish either that they face an imminent threat of serious bodily harm or that they reasonably believe they have no legal alternatives to violating the law. In support of their theory, appellants read United States v. Bailey and this court's precedent following Bailey to suggest that "imminence was one factor which could be considered in an analysis of whether 'reasonable alternatives' were available," but that it was not a necessary element of a justification defense.

But the appellants cleverly misread the Supreme Court's doctrine in Bailey and go on to misapply our precedent that relies upon Bailey. The Supreme Court held that escaped convicts were not entitled to an instruction on the defense of necessity or duress because the convicts did not immediately turn themselves in once they had escaped. In so holding, the Court noted that once the inmates had escaped, they no longer faced an imminent threat at the hands of allegedly abusive guards.

Bailey, 444 U.S. at 416-17. We have repeatedly and unquestioningly held that a defendant claiming a defense of necessity or duress must establish that he was under imminent fear of death or serious bodily harm. See, e.g., United States v. Jocic, 207 F.3d 889, 892 (7th Cir. 2000); United States v. Salgado-Ocampo, 159 F.3d 322, 326 (7th Cir. 1998); United States v. Haynes, 143 F.3d 1089, 1090 (7th Cir. 1998); United States v. Elder, 16 F.3d 733, 738 (7th Cir. 1994); United States v. Schulte, 7 F.3d 698, 699-700 (7th Cir. 1993). We decline appellants' invitation to revisit this long line of precedent and reaffirm our holding that a criminal defendant seeking to invoke a justification defense must, as a condition precedent, establish that he faced an imminent threat and had no reasonable legal alternatives to avoid that threat.

Appellants, nevertheless, contend that they did face an imminent threat and that they did avail themselves of all legal alternatives. They argue that prison officials were unresponsive to the concerns they expressed regarding racial tensions in the cells and that their requests for racially segregated housing were denied. They further argue that they believed that any recourse through other channels-- prison grievances being one example--would have been fruitless, and indeed might have further exacerbated the danger they faced.

Despite appellants' creative characterization of the threat they faced, none of the appellants alleged anything remotely resembling an "imminent threat." Instead, they made only vague and conclusory allegations about the state of USP-Marion and their generalized fears regarding future threats. We have noted in the past that "future" or "later" and "imminent" are opposites. Salgado-Ocampo, 159 F.3d at 327; Haynes, 143 F.3d at 1090. In this case, Kolb alleged primarily that he was assaulted by a black prisoner in December 1995 and February 1997, the latter more than two years prior to his possession of the knife in this case. Kolb further alleged that he had heard of attacks involving white and black inmates and that he feared the possibility that he might be moved to a unit in the prison where he might fear for his safety because he

might be housed with or near black inmates as opposed to being housed in an all-white environment. Tokash made similar allegations, complaining that he was a victim of racially motivated assaults in 1996 and 1997, again more than two years prior to his possession of the knife in this case. Usher, unlike Kolb and Tokash, failed to allege that he was ever a victim of racially motivated assaults, though he does complain that he feared being moved to an environment where he might be subjected to racially motivated assaults.

Appellants' allegation notwithstanding, we note again that prisons are inherently dangerous places and are inhabited by violent people, but that does not mean that all persons housed in a federal penitentiary, even one filled with the most dangerous prisoners of the land, face an imminent threat of physical assault. See Haynes, 143 F.3d at 1091; United States v. Sotelo, 94 F.3d 1037, 1040 (7th Cir. 1996). If fear of potential future violence were the appropriate standard, as appellants urge us to hold, the absurd result would be that every inmate in any prison across the country could justify their possession of a weapon simply by articulating a fear of some future, possible, and generalized threat. Indeed, we have previously rejected precisely such a formulation, holding that "[i]f prisoners could decide for themselves when to seek protection from the guards and when to settle matters by violence, prisons would be next to impossible to regulate. The guards might as well throw the inmates together, withdraw to the perimeter, and let them kill one another . . . ." Haynes, 143 F.3d at 1091. Appellate courts are ill-equipped to consider and adopt policies and practices to maintain the safety and security of this country's penitentiaries. Indeed, the operation of our correctional facilities is "peculiarly the province of the Legislative and Executive Branches of our government, not the Judicial." Bell v. Wolfish, 441 U.S. 520, 548 (1979).

Aside from appellants' failure to have alleged an imminent threat, they also failed to take advantage of alternative legal remedies prior to violating the law by arming themselves. It is telling that although Tokash, Kolb, and Usher claim to

have brought their concerns to the USP-Marion warden and another prison official, not one of them ever filed any sort of administrative grievance, alleging that they were housed in a condition that prison officials knew to be unsafe or were being detained in an area of imminent danger. Equally telling is the fact that none of the appellants have ever requested protective custody to escape the alleged threat. Indeed, Tokash was offered protective custody following a 1997 fight and he refused such housing. Cf. Sotelo, 94 F.3d at 1040 (denying defense of duress to inmates who failed to seek protection from prison authorities). We are convinced that the trial judge properly determined that Tokash, Kolb, and Usher feared only a generalized and unspecified possible future threat and that none of them ever availed himself of other adequate and reasonable legal remedies before arming themselves.

For completeness' sake, we comment that legal terms, like "imminence," can and do have different meanings in different contexts. In the context of the defense of necessity to a criminal charge of possession of a weapon in a prison, imminence means that a prisoner must demonstrate that the threat was immediate and that there was no reasonable alternative to violating the law. We observe that, in the context of the Prison Litigation Reform Act, see 28 U.S.C. sec. 1915(g), which makes an exception to the three-strikes provisions for prisoners who face an "imminent danger of serious physical injury," "imminent" may not be so narrowly defined as we have defined it in this case. By no means do we mean to suggest that the definition of imminence in the context of a justification defense is the same as the definition of imminence in the context of the PLRA.

C.  Denial of Subpoena Duces Tecum & Depositions

The appellants lastly challenge the trial judge's denial of their motions for subpoenas duces tecum, which they sought in order that they might discover evidence somewhere in USP-Marion records to support their necessity defenses. The trial judge denied the motion because the information sought by the appellants was

nothing but a fishing expedition and was not relevant to any available defense. Furthermore the trial judge ruled that the requested mountain of documents was an oppressive and unreasonable burden. The Supreme Court identified a four-part test to guide trial courts in the issuance of subpoenas in criminal cases pursuant to Fed. R. Crim. P. 17(c). First, the documents sought must be evidentiary and relevant. Second, the defendant must be unable through the exercise of due diligence to otherwise procure the documents reasonably in advance of trial. Third, the documents must be essential to prepare for trial. Finally, the application must be made in good faith and not intended as a general "fishing expedition." United States v. Nixon, 418 U.S. 683, 699-700 (1974); United States v. Ashman, 979 F.2d 469, 495 (7th Cir. 1992).

It is clear that appellants have failed to meet this test. They speculated the records would "document the racial tension, and inadequate remedies available at the Marion prison, as well as, repercussions following the attempt to utilize administrative procedures." The trial court, however, had ruled explicitly that the defendants were not entitled to proceed under a theory that their possession of the weapons was justified by necessity because they failed to make a threshold showing that they faced an imminent threat that necessitated disregard of the law prohibiting possession of weapons in federal penitentiaries.

The appellants argue that the trial court's ruling created a "chicken or egg" dilemma--that they could not establish the threshold showing of the required elements of their proposed necessity defense unless they were allowed their fishing expedition through the records of the Bureau of Prisons. But Rule 17(c) is not a discovery device to allow criminal defendants to blindly comb through government records in a futile effort to find a defense to a criminal charge. Instead, it allows only for the gathering of specifically identified documents which a defendant knows to contain relevant evidence to an admissible issue at trial. Nixon, 418 U.S. at 700; Ashman, 979 F.2d at 495.

IV.  Conclusion

We reiterate that prisons are violent places that are populated by violent individuals and as such are at times dangerous. The possession of weapons by inmates, such as the appellants, does not as they suggest lessen the danger and violence of penitentiaries, but instead contributes to it. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." Wolfish, 441 U.S. at 546-47. Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security, and we as an appellate court are ill-equipped to assume that responsibility. Id. at 547-48; see also McCoy v. Gilbert, 270 F.3d 503, 509-10 (7th Cir. 2002); Colon v. Schneider, 899 F.2d 660, 668-69 (7th Cir. 1990). The operation of our correctional facilities is "peculiarly the province of the Legislative and Executive Branches of our Government; not the Judicial." Wolfish, 441 U.S. at 548.

In this case, the appellants chose to disregard the law and armed themselves before testing available legal alternatives, such as filing grievances or seeking protective custody. Their claim that the racial tension in the prisons necessitated their hasty resort to self-help is without merit. Were we to be foolish enough to hold otherwise, we might as well hand the inmates the keys to their cell doors and allow them to govern themselves.

AFFIRMED.

FOOTNOTES

/1 The other three inmates found in possession of weapons during the May 19 search were also charged by the grand jury with violating sec. 1791(a)(2), though their cases are not relevant to this appeal.

/2 Tokash was ultimately charged in a three-count indictment as a result of two additional weapons or weapon-making tools. On August 9, 1999, USP-Marion officials discovered in Tokash's cell a stainless steel clasp from a watch band embedded

in a plastic handle, which could be used as a cutting tool to fashion prison-made knives. On June 9, 2000, Tokash was found with a homemade plastic knife. Officials found a homemade steel knife in a pouch of tobacco in Kolb's cell on October 5, 1999, and he was charged in a superseding indictment with two counts of violating sec. 1791(a)(2). On June 9, 2000, Usher was taken from his cell to the USP-Marion hospital for an x-ray examination to search for internally concealed weapons. When Usher arrived at the x-ray table, he forcibly resisted the correctional officers attempting to move his restraints so that the x-rays could be taken, and the x-ray pictures were blurred. A rectal digital examination revealed a hard foreign object. Usher was taken to a "dry cell," one with no running water or other means to dispose of contraband, where he ultimately defecated an object into a bed pan. Rather than bring the object to prison officials, which turned out to be a plastic knife, Usher attempted to destroy it by breaking it on the edge of a concrete bed. The superseding indictment charged Usher with two counts of possessing a weapon in a federal prison, 18 U.S.C. sec. 1791(a)(2) and one count, under the Assimilative Crimes Act, 18 U.S.C. sec.sec. 7(3) & 13 and Illinois Criminal Code, 720 ILCS 5/31-4(a), of destruction of evidence relating to his attempt to destroy the plastic knife concealed in his rectal cavity on June 9, 2000.