In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-1642

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID M. SAHAKIAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99 CR 40044—**J. Phil Gilbert**, *Judge.*

ARGUED SEPTEMBER 21, 2005—DECIDED JULY 12, 2006

Before COFFEY, EVANS, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* On June 9, 2002, David Sahakian, an inmate at the United States Penitentiary at Marion, Illinois ("USP-Marion") and the reputed leader of the prison's "Aryan Brotherhood" gang, was charged in a fourth superceding indictment with first degree murder, in violation of 18 U.S.C. §§ 1111, 7(3) and 2, conspiracy to commit first degree murder, in violation of 18 U.S.C. § 1117, and possession of a weapon in prison, in violation of 18 U.S.C. § 1791(a)(2). Prior to trial, the government filed a motion *in limine* to preclude Sahakian from presenting the defense of necessity at trial, which the trial judge granted. On September 8, 2003, the district court commenced a jury trial that lasted sixty-nine days. After

eight days of deliberations the jury was unable to reach a consensus on the murder and conspiracy to commit murder charges and they were subsequently dismissed. However, the jury did return a guilty verdict on the possession of a weapon in prison charge, resulting in Sahakian being sentenced to sixty months in prison. On appeal, Sahakian challenges his conviction arguing that the trial judge erred in precluding him from introducing the defense of necessity concerning the possession of a weapon in prison charge. We affirm.

## I. BACKGROUND

In 1992, in a proceeding unrelated to this case, David M. Sahakian was convicted of being a felon in possession of a handgun and sentenced to 360 months in federal prison. *See United States v. Sahakian*, 965 F.2d 740, 741 (9th Cir. 1992). He has been incarcerated at USP-Marion[1] ever since. The institution is a federal maximum security prison with a well-documented history of violence. *See, e.g., United States v. Tokash*, 282 F.3d 962, 966 (7th Cir. 2002); *Caldwell v. Miller*, 790 F.2d 589, 592-93 (7th Cir. 1986). The potential cause of the tempestuous atmosphere at USP-Marion can, at least in part, be attributed to the violent nature of the inmates housed in the prison as well as the proliferation of gang membership and their attenuated violent activities within the penitentiary's walls. *See Tokash*, 282 F.3d at 962-63.

Two of the more prominent gangs operating covertly at USP-Marion during the time period of the late '90s were the

---

[1] USP-Marion is "a high security facility housing male inmates" located in southern Illinois.

"Aryan Brotherhood,"[2] composed primarily of white prisoners, and the "DC Blacks," made up of mainly African-American prisoners. According to the record, the Aryan Brotherhood maintained a running oral "hit list" of black prisoners that, if encountered, should be attacked and/or killed. In order to bolster their violent tendencies, members of the Aryan Brotherhood, and associated gangs such as the "Dirty White Boys," carried weapons known as "shanks,"[3] which the members of the gangs often carried in their rectal cavities in order to conceal them from corrections officers.

On May 18, 1999, Terry Lamar Walker, a black inmate at USP-Marion, was stabbed to death by inmate Richard McIntosh who was armed with a shank, *see supra*, while another inmate, Carl Knorr, held him. The entire incident was witnessed by two correctional officers, who identified the inmates taking part in the attack as members of the Dirty White Boys gang. Following the stabbing, corrections officers interviewed a number of inmates about the murder. One of the inmates associated with both the Dirty White Boys and the Aryan Brotherhood agreed to cooperate on the condition of anonymity. He informed the investigating officers that Sahakian was a "shot-caller" or leader of the Aryan Brotherhood gang at USP-Marion and had ordered Walker's murder as a "favor" to one of the prison's other gangs, the "Mexican Mafia." When asked about the weapons used to carry out the murder, the informant told corrections

---

[2]  According to the record, the Aryan Brotherhood gang originated in the California State prison system and later spread to the federal prison system. Among other things, the gang has been known to incite violence and carry out coordinated attacks against other inmates, primarily African-Americans.

[3]  In prison colloquialism, the term "shank" refers to a crudely fashioned prison-made knife. *See, e.g., King v. One Unknown Federal Correctional Officer*, 201 F.3d 910, 912 n. 1 (7th Cir. 2000).

officers that at least six members of the Aryan Brotherhood contemporaneously had shanks in their possession. According to the anonymous inmate, each member of the Aryan Brotherhood had possession of one of the six shanks for a week at a time, and would then transfer it on to another member. He also told guards that in order to identify which member of the gang had possession of the dangerous weapons at that particular time, they would need to x-ray them–as the shanks were concealed in their rectums. The informing inmate gave the officers a list of Aryan Brotherhood members that he suspected were carrying concealed shanks and that should be x-rayed, including Sahakian.

After gaining this information the prison officials proceeded to conduct a "shakedown"[4] at the institution in an effort to locate additional weapons and weapon-making tools. Sahakian was one of the first to be segregated from the general population for an x-ray examination. He was escorted to the institution hospital, where he agreed to comply and admitted having a shank in his possession. Sahakian was then taken to a dry-cell[5] where, after fifteen minutes of self-examination, he was finally able to remove the shank, wrapped in plastic, from his rectal cavity. Inside of the plastic was a four and one-half inch piece of sharpened metal covered with a plastic tip and wrapped in toilet paper.

---

[4] A "shakedown" is a maneuver whereby guards, without advance notice, remove prisoners from their cells in order to search the cells and/or the prisoners for contraband and unauthorized property; strip searches and x-ray procedures are commonly employed as part of a shakedown. *See Tokash*, 282 F.3d at 966; *United States v. Thompson*, 807 F.3d 585, 587 (7th Cir. 1986); *Bono v. Saxbe*, 620 F.2d 609, 620 (7th Cir. 1980); *Stewart v. McGinnis*, 800 F. Supp. 604, 607 (N.D. Ill. 1992).

[5] A "dry cell" is one with no running water or other means to dispose of contraband.

After many months of investigation and the filing of four superceding indictments, Sahakian was indicted by a grand jury on one count of first degree murder, in violation of 18 U.S.C. §§ 1111, 7(3) and 2, conspiracy to commit first degree murder, in violation of 18 U.S.C. § 1117, and possession of a weapon in prison, in violation of 18 U.S.C. § 1791(a)(2).[6] Prior to trial, the government filed a motion *in limine* in an attempt to bar Sahakian from introducing evidence of his defense theory of "necessity."[7] The district court granted the government's motion, finding that Sahakian had failed to demonstrate an imminent threat to his safety and that there were legal alternatives to carrying a weapon which Sahakian failed to exhaust, thus prohibiting him from presenting evidence of a necessity defense. Following a sixty-nine day jury trial and eight additional days of deliberations, the trial judge determined that the jury was hung on the murder and conspiracy to commit murder charges, but accepted a guilty verdict they reached against Sahakian on one count of being in possession of a weapon while confined in prison, in violation of 18 U.S.C.

---

[6] Section 1791(a)(2) punishes an inmate who "makes, possesses, or obtains, or attempts to make or obtain, a prohibited object," including any object that "threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual." 18 U.S.C. § 1791(a)(2) & (d)(1)(F).

[7] Like self-defense or duress, necessity is an affirmative defense "designed to spare a person from punishment if he acted 'under threats or conditions that a person of ordinary firmness would have been unable to resist,' or if he reasonably believed that criminal action 'was necessary to avoid a harm more serious than that sought to be prevented by the statute defining the offense.'" *United States v. Bailey*, 444 U.S. 394, 410 (1980); *see Tokash*, 282 F.3d at 969. However, such a defense may only be presented to a jury where the defendant establishes that there was no "reasonable, legal alternative to violating the law." *Id.*

§ 1791(a)(2).[8] On February 18, 2005, Sahakian was sentenced to 60 months in prison, followed by three years of supervised release, and $150 in fines and assessments.

## II. ISSUES

On appeal, Sahakian alleges that the district court erroneously granted the government's motion *in limine*. Specifically, he argues that he should have been allowed to introduce evidence concerning the dangerous atmosphere for prisoners such as himself at USP-Marion. Also, he argues that he should have been permitted to submit an instruction to the jury at the conclusion of the trial informing them that, if they found that it was "necessary" for him to carry a prison-made knife in order to avoid "immediate serious bodily harm or death," he should be found not guilty of the prisoner in possession of a weapon charge.

## III. ANALYSIS

The legal sufficiency of a proffered affirmative defense is a question of law which we review *de novo*. *United States v. Simmons*, 215 F.3d 737, 740-41 (7th Cir. 2000). We have consistently held that a district court may properly deny a defendant the opportunity to introduce evidence supporting an affirmative defense by granting a pre-trial motion *in limine*, so long as the facts proffered by the defendant to support the defense are insufficient as a matter of law to meet the minimum standard as to each of the elements of that defense. *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002); *United States v. Santiago-Godinez,* 12 F.3d 722, 727 (7th Cir. 1993). Indeed, this is

---

[8] The jury could not reach a verdict on the murder or conspiracy counts, and the court ordered a mistrial on those charges.

what the district court concluded in Sahakian's case. The district judge found that, even if all of the facts Sahakian presented were accepted as true, he would still be unable to establish the elements of a necessity defense. We agree.

A defendant seeking to invoke the defense of necessity in a criminal case must establish that he faced an imminent threat of serious bodily injury or death and that he had no reasonable legal alternatives to avoid that threat. *Id.* at 969-71 (citing *Bailey,* 444 U.S. at 409-11). In *United States v. Tokash*, we addressed the issue of what constitutes an "imminent threat" in the prison context. 282 F.3d 962. In a case based on the same incident giving rise to this prosecution, *i.e.*, the murder of Terry Walker at USP-Marion, we concluded that the word "imminent" should be construed narrowly in the prison context. *Id.* at 971. In doing so we determined that a prisoner must establish that he experienced something more than a "generalized fear of attack by some unknown or unspecified assailant at some unknown time in the future." *Id.* at 966. Instead, he must demonstrate "the threat was immediate and that there was no reasonable alternative to violating the law." *Id.* at 971.

Additionally, in *Tokash* we reaffirmed our holding that an imminent threat of death or serious bodily harm is an essential and necessary element of a necessity defense. *Id.* at 969 (stating that: "We have repeatedly and unquestioningly held that a defendant claiming a defense of necessity or duress must establish that he was under imminent fear of death or serious bodily harm."). Although we acknowledged that prisons are inherently dangerous places, we stressed that this perilous atmosphere, *per se*, does not justify the possession of a weapon. *See id.* at 970. Rather, we noted that arguments involving generalized allegations of violence within a prison are unavailing and stated: "If prisoners could decide for themselves when to seek protection from the guards and when to settle matters by violence, prisons would be next to impossible to regulate.

The guards might as well throw the inmates together, withdraw to the perimeter, and let them kill one another . . . ." *Id.* (quoting *United States v. Haynes*, 143 F.3d 1089, 1091 (7th Cir. 1998)).

Sahakian argues that the definition of "necessity" should be read more broadly in his case because he genuinely feared for his life due to the unpredictability of his contact with other prisoners and the violent atmosphere at USP-Marion. Sahakian also suggests that this case can be distinguished from *Tokash* because he, unlike the defendant in *Tokash*, experienced a real and particularized threat to his life by way of rumors that there was a "price on his head," and, thus, such a statement should not be classified merely as a "generalized threat" of a future act of violence. *Id.* at 970.

Sahakian's arguments are ultimately unpersuasive. The rumor that there was a contract out on his life presents, at best, a threat of *future* violence against him at some unspecified time, as opposed to a threat which was immediate or imminent in nature. For instance, Sahakian does not allege that the person making the supposed threat against him was standing in front of him with a knife or other weapon at the time he informed Sahakian that he would like to see him dead. In fact, Sahakian was unable to identify the source of the threat and only stated that the DC Blacks, a rival gang, had "targeted [him] for death." This is the same sort of generalized future threat of violence that we addressed in *Tokash*. As we noted in that case, " 'future' or 'later' and 'imminent' are opposites." 282 F.3d at 970. Whether reasonable or not, Sahakian's fear that he *might* be assaulted at some future point by some *unidentified* inmate without any corroboration or identification of a specific assailant, is insufficient to demonstrate an entitlement to the necessity defense. To hold that Sahakian was faced with an imminent threat based on a rumor he heard from some unknown and unidentified individual would

essentially require that each and every inmate who has allegedly received a vague unsubstantiated threat be allowed to arm himself, threatening the safety of guards as well as other prisoners; this would be less than reasonable. *See also United States v. Bell*, 214 F.3d 1299, 1301 (11th Cir. 2000) (noting that the defense is reserved for "extraordinary circumstances" which "require nothing less than immediate emergency."). The consequences of such a concession would only serve to exacerbate the already violent environment at USP-Marion and any other federal prisons or places of confinement.

Sahakian has also failed to demonstrate that the shank he carried would have been of any use to him if he was confronted with "imminent" danger. The record establishes that it took Sahakian approximately fifteen minutes to remove the weapon from his body cavity when prison officers directed him to do so. Obviously, with the quarter-of-an-hour spent retrieving the weapon, it would be nigh on impossible for Sahakian to protect himself from any threat, much less one that was immediate or imminent. In light of the level of violence Sahakian described at USP-Marion, as well as the swift, ruthless and orchestrated manner in which Terry Walker was murdered, it is unlikely that a prospective attacker would extend the courtesy of allowing him to retrieve the knife before taking his life.

Equally fatal to his claim of entitlement to a necessity defense is that Sahakian failed to establish that he had exhausted all other reasonable legal alternatives before he decided to take matters into his own hands. *Bailey*, 444 U.S. at 410. In *Bailey*, the Supreme Court made clear that a necessity defense is only available where it has been established that the defendant had no "reasonable, legal alternative to violating the law." *Id*. Expounding on the Supreme Court's decision in *Bailey*, we noted in *Tokash* that there are an abundance of legal alternatives to possessing a weapon in prison, such as filing a proper administrative

grievance with prison officials or requesting, based upon good cause, to be placed in protective custody or segregation. 282 F.3d at 970. In *Tokash*, we held that those reasonable legal alternatives remained viable despite Tokash's argument that informing the prison guards would prove "futile." *Id.* at 966. Likewise, in this case, Sahakian argues that pursuing legal alternatives would have been otiose. We respond by reaffirming the theory advanced in *Tokash* that: "'If prisoners could decide for themselves when to seek protection from the guards and when to settle matters by violence, prisons would be next to impossible to regulate. The guards might as well throw the inmates together, withdraw to the perimeter, and let them kill one another . . . .' Appellate courts are ill-equipped to consider and adopt policies and practices to maintain the safety and security of this country's penitentiaries. Indeed, the operation of our correctional facilities is 'peculiarly the province of the Legislative and Executive Branches of our government, not the Judicial.'" *Id.* at 970; *Bell v. Wolfish,* 441 U.S. 520 (1979).

Sahakian, as did the defendants in *Tokash*, falls far short of demonstrating that he exhausted all available lawful means of avoiding the alleged contract on his life before resorting to carrying a weapon. He never informed the prison guards of the threat on his life, he did not request to be moved and he did not ask to be placed in protective custody. Rather, he chose to take the matter into his own hands by carrying a concealed weapon, an action this court has been well advised not to condone in the past and will not excuse in this case. *See generally id*.

## III.  CONCLUSION

The decision of the district court is

AFFIRMED.

No. 05-1642                                                    11

A true Copy:

    Teste:

                                  _____
                                    *Clerk of the United States Court of*
                                    *Appeals for the Seventh Circuit*