In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2725

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CLEVELAND J. WHITE FEATHER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 4:11CR40060-001 — **J. Phil Gilbert**, *Judge.*

ARGUED APRIL 7, 2014 — DECIDED SEPTEMBER 29, 2014

Before WOOD, *Chief Judge*, and KANNE and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Cleveland White Feather killed his cellmate, Robert Running Bear, in their cell at the federal prison in Marion, Illinois. He did this by disemboweling the victim using a disassembled Bic razor, having first choked him into unconsciousness during a late-night fight of rather opaque

origins. White Feather was charged with murder by a federal prisoner, *see* 18 U.S.C. § 1118, and before trial the government moved to preclude him from offering a defense of self-defense. The district judge deferred ruling and permitted White Feather to present evidence in support of the defense at trial. In the end, however, the judge concluded that White Feather was not entitled to a self-defense jury instruction because the evidence did not support it. The jury swiftly found White Feather guilty, and he now appeals. The sole issue for our review is the judge's refusal to instruct the jury on self-defense. We affirm.

## I. Background

On December 1, 2009, White Feather and Running Bear were housed together in Cell 202 of L Unit at the United States Penitentiary in Marion, Illinois ("USP-Marion"). White Feather was serving a life sentence for murder. Running Bear was serving a 24-month sentence for failing to register as a sex offender. At six feet tall and 170 pounds, Running Bear was the larger man; White Feather is five feet seven inches tall and weighs 140 pounds. White Feather was also older (age 54 at the time of these events) and has a history of medical problems including bleeding ulcers and an unspecified foot condition. No evidence suggests that Running Bear had any physical infirmities.

Each cell in L Unit is equipped with a duress button to summon guards in the event of an emergency. This button, affixed to the wall of the cell, emits a loud sound in the guard station when pressed. The alarm cannot be silenced remotely but must be manually reset in the cell by the guard who

responds to the call. Trial testimony established that the duress button in Cell 202 was never pushed on the night of December 1.

At some point that night, an argument erupted between White Feather and Running Bear. What actually transpired is known to us primarily through White Feather's own statements in two interviews with FBI agents and from his testimony at trial. The genesis of the dispute appears to be that White Feather wanted to keep the cell lights on to continue writing a letter, while Running Bear wanted to turn the lights off. White Feather's account varies in his different tellings, but the important fact is that the argument quickly turned violent. White Feather claims that Running Bear came at him brandishing a blade from a disassembled Bic razor. White Feather testified that when he saw Running Bear wielding the razor blade, he resolved to kill him. ("Q. At that moment, you were going to kill him; right? A. Yes. Q. No matter what happened, at that moment you decided, I'm going to kill this man. A. Yes.")

White Feather managed to subdue Running Bear at several points during the altercation. In his initial statement to FBI investigators, White Feather said that when Running Bear first assaulted him, he was able to maneuver and put him in a choke hold, rendering him unconscious. Additional details emerged at trial: White Feather testified that he used a sharp thumb-jab to Running Bear's throat to knock him out. While his cellmate was unconscious, White Feather retrieved the razor blade and placed it in a blue folder, where it was later

found. White Feather sustained a small cut on his finger in this initial assault.

At some point Running Bear regained consciousness and, according to White Feather's account, rushed at him with a second razor blade that "came out of the middle of nowhere." White Feather again managed to incapacitate his adversary by choking him until he lost consciousness. After waiting a minute or two, White Feather put his hand over Running Bear's mouth and nose to suffocate him until he stopped moving. He admitted on cross-examination that he was trying to kill his cellmate, not just incapacitate him in order to buy time to summon help.

White Feather testified that at this point he began to feel unwell. He started to throw up blood—apparently a manifestation of his bleeding ulcers, not any injury sustained in the fight—and he said he "felt like [he] was about ready to go to sleep." Running Bear remained unconscious, lying on the floor of the cell with his legs partly under his bunk. White Feather decided that he needed a makeshift method to detect if Running Bear started to regain consciousness, so he put some toilet paper over his unconscious cellmate's mouth. When White Feather saw the paper move, he dragged Running Bear out from under the bed and said, "I'm sorry, you wanted to kill me? Now I'm going to kill you."

White Feather then gutted his victim with the razor blade, slicing Running Bear's abdomen with "a sawing motion" for approximately four minutes. When the opening in Running Bear's abdomen was large enough, he reached his hand inside and attempted to pull out Running Bear's heart "to make sure

that he could never get back up." As he told the jury: "I just stuck my hand inside and reached as far as I could and grabbed whatever I could just feel and pull." When he could not find the heart, he eventually settled on Running Bear's liver. When he was done, he placed Running Bear on his bed and covered him with a blanket.

White Feather then turned his attention to cleaning up the scene. He put the razor blade in an envelope and placed it on an unoccupied third bunk in the cell. He tried without success to wipe the blood off the floor with a blanket. He then stayed awake until about 4:30 a.m. talking to Running Bear and listening to gurgling noises emanating from his body.

White Feather left his cell at 5:57 a.m. on December 2, and surveillance video shows him going about his day for the next couple of hours. At about 8:30 a.m., shortly after the 8 a.m. change of shift for prison guards, a corrections officer noticed that Cell 202 had a sheet covering its entrance and instructed White Feather to remove it. White Feather replied that he wanted to talk to the officer about something. The officer took White Feather aside, handcuffed him, and called for assistance. Responding officers found Running Bear's body under a blanket on his bed in Cell 202. USP-Marion officials placed Unit L on lockdown. Medical personnel were called, but Running Bear had been dead for some time.

The FBI was notified and agents soon arrived on the scene and took control of the investigation. They gave White Feather *Miranda* warnings, and he gave them a statement recounting the events of the night of December 1 and early morning hours

of December 2. His account in this first interview was substantially the same as the one we've described above.

An autopsy of the victim was performed on December 3; the forensic pathologist who performed it testified extensively at trial. He noted that the wound to Running Bear's abdomen measured 14 x 7 centimeters and that some of the victim's internal organs were protruding from it. There was damage to his liver consistent with tearing or grinding and blood in the abdominal cavity from both the cutting of the abdomen and the damage to the liver. The pathologist concluded that Running Bear died from abdominal trauma, with asphyxia playing a contributory role.

White Feather's story changed a bit during a second interview with FBI agents a few months later. He claimed that Running Bear hit him during the altercation, knocking a tooth out. Other minor details varied as well. For example, White Feather said he was angry at Running Bear for not showing him sufficient respect. He also gave a different account about what he did with the razor blade after choking or suffocating Running Bear into unconsciousness.

White Feather was charged with murder by a federal prisoner serving a life sentence. *See* 18 U.S.C. § 1118. The government moved in limine to preclude any justification defense of self-defense. The district court reserved ruling and allowed White Feather to present his testimony in support of self-defense at trial. At the close of the evidence, the judge declined to instruct the jury on self-defense, concluding as a matter of law that Running Bear "was not imposing an imminent threat of … harm or deadly force" when White

Feather sliced into his abdomen with the razor. The jury took less than an hour to return a verdict of guilty.

## II. Discussion

White Feather limits his appeal to the district court's refusal to instruct the jury on self-defense. A defendant is entitled to a jury instruction if, among other things, "the instruction reflects a theory that is supported by the evidence," and "the failure to include the instruction would deny the [defendant] a fair trial." *United States v. Jackson*, 598 F.3d 340, 345 (7th Cir. 2010) (quoting *United States v. Prude*, 489 F.3d 873, 882 (7th Cir. 2007)).

In order to offer a defense of self-defense, a defendant must "as a condition precedent, establish that he faced an imminent threat <u>and</u> had no reasonable legal alternatives to avoid that threat." *United States v. Tokash*, 282 F.3d 962, 969 (7th Cir. 2002); *see also United States v. Haynes*, 143 F.3d 1089, 1091 (7th Cir. 1998); *United States v. Bailey*, 444 U.S. 394, 410–11 (1980). Self-defense is a viable legal justification only if the defendant was faced with an actual, *imminent* threat of physical harm. This is so even in prisons where threats and violence are common. *Tokash*, 282 F.3d at 969–71.

We review de novo a district court's refusal to allow a jury instruction on a defendant's theory of defense. *Jackson*, 598 F.3d at 345. The district court may properly refuse a jury instruction on an affirmative defense if the defendant has failed to support each element of the defense with some evidence. *Tokash*, 282 F.3d at 967 (explaining that the defendant must present

"more than a scintilla of evidence" on each of the legal require-
ments for the proposed defense (quoting *United States v.
Blassingame,* 197 F.3d 271, 279 (7th Cir. 1999))).

This circuit recognizes three "lesser-evil" defenses that may
justify otherwise unlawful action: duress, necessity, and self-
defense. *Haynes,* 143 F.3d at 1091. Each of these defenses "rests
on the belief that a person facing harm is justified in perform-
ing an act, otherwise illegal, less injurious than the impending
loss." *Id.* Critically, to warrant a jury instruction on a lesser-evil
justification defense, the defendant must present evidence that
he faced actual, imminent harm and had no reasonable legal
alternatives to avoid it. *Tokash,* 282 F.3d at 969.

Imminence is an essential element for self-defense because
the threatened harm may, in fact, be avoidable: "[I]f the threat
is not imminent, a retreat or similar step avoids injury."
*Haynes,* 143 F.3d at 1091. Importantly, a defendant's subjective
belief that he had no available legal alternatives—even if
objectively reasonable—is not enough to proceed with a
justification defense if the evidence is insufficient to establish
an actual, imminent threat of physical harm. *Tokash,* 282 F.3d
at 969 (rejecting an argument that the defendant's reasonable
belief that he had no legal alternatives should suffice to permit
a justification defense in the absence of a showing of immi-
nence). For self-defense claims in particular, we have consis-
tently held that the defendant must have evidence that he was
under an imminent threat of death or serious bodily harm *and*
that he had no reasonable legal alternatives to avoid that
threat. *Id.*

The requirement of imminence is no less applicable in a prison than anywhere else. For example, in *Tokash* we rejected a necessity defense in a case involving inmates at USP-Marion who were caught in possession of concealed weapons. *Id.* at 965–68. The defendants pointed to an atmosphere of racial tension and frequent outbreaks of violence at the prison and argued that because the threat of violence was pervasive, they were entitled to assert a necessity defense. We resoundingly rejected this argument, explaining that evidence of frequent violence in a prison—an "inherently dangerous place[] … inhabited by violent people"—does not establish the kind of imminent threat required to support a necessity defense. *Id.* at 970 (citing *Haynes*, 143 F.3d at 1091; *United States v. Sotelo*, 94 F.3d 1037, 1040 (7th Cir. 1996)). *Haynes* involved a violent preemptive strike by a prisoner against a fellow inmate who frequently tormented him. 143 F.3d at 1089–90. We noted that "although prisons are nasty places, they are not jungles," and held that the imminence requirement was fully applicable. *Id.*

Here, the district court held that White Feather lacked evidence of an imminent threat. No other conclusion is remotely possible. Even if Running Bear was the initial aggressor, he was unconscious when White Feather dragged him out from under his bed and attacked him with the razor. An unconscious adversary does not pose an imminent threat of death or serious bodily harm.

White Feather insists that he waited to see if Running Bear "was alive and therefore an imminent threat again" before he acted. The "critical moment," he argues, is the point at which the toilet paper on Running Bear's face moved; it was then that

he believed he needed to kill or be killed. As an initial matter, this argument contradicts White Feather's own testimony. He admitted on cross-examination that he had resolved to kill Running Bear earlier in the altercation, at the moment he was first assaulted, or at least at the point when he suffocated his unconscious victim. Perhaps more importantly, by White Feather's own account, Running Bear was still unconscious when he dragged him out from under the bed and cut his abdomen open:

> Q. So you pull him — he's been laying there doing nothing. You pull him out, he's doing nothing, and then you slice him up; right?
>
> A. Right.

That alone defeats the claim of self-defense, but for completeness we note that White Feather also failed to present evidence that he had no alternatives to the use of deadly force. A defendant seeking to justify his actions as a lesser evil must avail himself of reasonable legal alternatives to the use of unlawful force. Again, this requirement applies equally in prison: "If prisoners could decide for themselves when to seek protection from the guards and when to settle matters by violence, prisons would be impossible to regulate." *Haynes*, 143 F.3d at 1091; *see also Bailey*, 444 U.S. at 410 ("Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail." (quoting WAYNE LAFAVE & AUSTIN W. SCOTT, JR., HANDBOOK ON CRIMINAL LAW 379 (1972))).

White Feather had several legal alternatives to the use of deadly force. Most obviously, the cell was equipped with a duress button, and the government presented ample evidence about the operation of the duress signal and how it was designed to require prison guards to respond to the source of the alarm. In addition, the officer on duty in the L Unit on the night of December 1 testified that the unit was "very quiet," and that if an inmate yelled or banged on his cell door, a guard would hear and immediately respond.

White Feather claims that prisoners at USP-Marion were never instructed on the use of the duress button. He admitted, however, that he thought it was a "medical button" and understood that "[i]f you pushed it, doctors would come." So White Feather knew that he needed only to push the button and *someone* would come. He also acknowledged that during any of the several periods of time when Running Bear was unconscious, he could have yelled or "banged on the [cell] door and asked for help" but simply did not.

In short, even accepting that Running Bear was the initial aggressor, there is no evidence that he posed an imminent threat when White Feather cut him open with the razor or that alternatives to this use of deadly force were unavailable. White Feather killed Running Bear slowly, deliberately, and savagely, while his victim was unconscious and posing no imminent threat, and in the presence of reasonable legal alternatives to the use of deadly force. Because no evidence supports White Feather's claim of self-defense, the district court properly refused to instruct the jury on the defense.

AFFIRMED.