NOTICE
Decision filed 01/06/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180023-U

NO. 5-18-0023

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 15-CF-1067 |
| | ) | |
| ALVIN HARRIS, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where the defendant, Alvin Harris, did not establish by a preponderance of the evidence that he believed he was justified in stabbing the victim, there is no foundation for reducing his conviction for first degree murder to second degree murder, and we affirm his conviction. Where the trial court judge considered the mitigating nature of the defendant's intellectual disability and mental health impairments at sentencing, we affirm the sentence. Where the sentence did not violate the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) or the eighth amendment of the United States Constitution (U.S. Const., amend. VIII), the sentence was not unconstitutional, and we affirm.

¶ 2    The defendant, Alvin Harris, was found guilty of first degree murder and aggravated battery of a child after a bench trial. He was sentenced to a total of 60 years in the Illinois Department of Corrections followed by 3 years of mandatory supervised release. In this direct appeal, the defendant contends that the evidence showed that he was simply reacting to being

1

stabbed by the victim, Sharetta Day. He therefore argues that he proved by a preponderance of the evidence that the existence of a mitigating circumstance was sufficient to reduce the first degree murder charge to second degree murder. The defendant also argues that his 60-year sentence is the equivalent of a life sentence and is unconstitutional because the sentencing judge failed to properly consider the mitigating nature of his intellectual disability and his mental health impairments, and because it violated the proportionate penalties clause of the Illinois Constitution as well as the eighth amendment of the United States Constitution. For the reasons stated in this order, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4     On September 25, 2015, the State charged the defendant with one count of first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Code) for causing the stabbing death of Sharetta Day on August 29, 2015. 720 ILCS 5/9-1(a)(1) (West 2014). That same day, the defendant was also charged with attempted first degree murder in violation of section 9-1(a)(1) of the Code and one count of aggravated battery to a child in violation of section 12-3.05(b)(1) of the Code. 720 ILCS 5/9-1(a)(1), 12-3.05(b)(1) (West 2014). Both of those charges involved the stabbing of a juvenile under the age of 13.

¶ 5     The events at issue in this case all occurred in a Swansea apartment on August 29, 2015. No one other than the defendant and the victim were present the entire time. The victim's son, N.D., then nine years of age, was present in the apartment for part of the time. The background facts that follow are based upon the trial testimony of the defendant, N.D., the investigating officers, the mother of the defendant's children, Charna Wooten, and the victim's next-door neighbor, Staniece Luster. The case was tried without a jury.

¶ 6 The defendant testified that the victim, Sharetta Day, lived in the Swansea apartment with her son, N.D., the juvenile victim. Sharetta and the defendant were in a relationship. On August 29, 2015, the defendant sent a text message to Sharetta. She did not text him back. The defendant then used the Metrolink service to travel to Sharetta's apartment because she had not responded. Just before he arrived at her apartment, the defendant received a return text from Sharetta.

¶ 7 The defendant testified that upon his arrival at Sharetta's apartment, the defendant and Sharetta argued about how much the defendant texted her. The argument lasted for approximately 10 minutes. At some point during the argument, Sharetta went into her bedroom. The defendant followed her into the bedroom and Sharetta retrieved a knife from her purse. She said to the defendant," Alvin, don't walk up on me." The defendant told her that he was not "walking up" on her, but that he wanted to know what was wrong with her and why she had gotten out a knife. He then attempted to approach Sharetta with his cell phone so that he could show her the timestamp depicting when he had finally received her responsive text message. According to the defendant, as he approached her, Sharetta stabbed him in the chest.

¶ 8 The defendant testified that after Sharetta stabbed him, he grabbed a black knife that was on her bedroom dresser. The two began to struggle over the knife. The defendant dropped the black knife. The struggle moved into the living room. Sharetta's son, N.D., had just returned from the next-door neighbor's apartment and was in the living room when Sharetta and the defendant exited the bedroom and moved into the living room. N.D. told them to stop fighting. N.D. tried to stop the fight and was stabbed twice by the defendant. The defendant stated that he was trying to disarm Sharetta and accidentally injured N.D. The defendant eventually obtained Sharetta's knife and stabbed her, exclaiming repeatedly: "Why did you stab me?" N.D. and Sharetta were able to exit the apartment.

3

¶ 9     The defendant testified that he stayed in the apartment and laid down the floor. He called the mother of his children, Charna Wooten. The defendant told her that he had "stabbed up" Sharetta, that he had been stabbed in the fight, and that he was scared that the police would kill him or put him in prison for the rest of his life. The defendant also spoke to his daughter, Porsha Cobb, and told her that he had been stabbed.

¶ 10    Police responded to the apartment and saw Sharetta lying on the ground and N.D. walking toward them. The defendant was taken into custody and then to the hospital for treatment for his stab wound. Sergeant Frank testified that in interviewing the defendant after he was discharged from the hospital, the defendant was consistent with the claim that Sharetta had stabbed him first.

¶ 11    The next-door neighbor, Staniece Luster, testified that she was in her apartment when she heard a fight begin in Sharetta's apartment. She went to Sharetta's door and called out. Luster testified that she heard Sharetta and N.D. yelling for help. Luster went back to her apartment and called the police. Luster testified that she did not witness anything that happened in Sharetta's apartment.

¶ 12    N.D. testified that he was 11 years old on the date of his testimony. He came home on the evening of August 29, 2015, from spending time with a friend. Upon entering the apartment, he found his mother, Sharetta, and the defendant arguing over how many text messages he sent her. He then went next door to Staniece's apartment to get a trash bag. While waiting for the trash bag, he heard his mother yelling and he went back home. When he walked back into the apartment, he saw the defendant holding his mother's arm. The defendant told N.D. and Sharetta to go into the bedroom and to shut up or he will kill them. While in his mother's bedroom, he noticed that his mother was holding her knife in her hand. He also saw that the defendant was

4

holding a knife. N.D. testified that he did not see when either picked up knives. The defendant pulled N.D. and his mother back to the living room. When they were close to the living room, he saw his mother cut the defendant with her knife. The defendant then took his mother's knife away and began stabbing her. N.D. was also stabbed twice—once in his neck and a second time in his side. He tried to run away, but the defendant caught him and threw him against a wall.

¶ 13    Dr. Delwin Merchant, a medical director of the emergency rooms at Memorial Hospital in Belleville and Memorial East Hospital in Shiloh, testified at trial. On August 29, 2015, Dr. Merchant was working in the Memorial East Hospital emergency room. The defendant was brought in by ambulance. Dr. Merchant testified that he examined and treated the defendant for one superficial chest wound. He defined a superficial wound as "one that goes through the skin and into the top fat layer *** underneath the skin." Dr. Merchant testified that he cleaned, anesthetized, and closed the defendant's chest wound with four stitches.

¶ 14    Dr. James A. Pettuchak, a forensic pathologist employed by St. Clair County, conducted an autopsy. Dr. Pettuchak testified that Sharetta suffered multiple injuries caused by a knife. Sharetta sustained a total of 12 stab wounds and 1 additional exit wound—2 in the right side of her chest, 2 in the left side of her chest, 2 in the front of her left arm, 1 exit wound on the back of her left arm, 1 under her chin, and the remainder on both shoulders. The four chest wounds were measured at a depth of approximately three inches. The two wounds on the right side of the chest entered the right lung. One of the wounds on the left side of the chest entered the left lung and the other entered the heart. Dr. Pettuchak testified that all four chest wounds were fatal in nature.

¶ 15    Dr. Daniel J. Cuneo, a clinical psychologist, testified at trial that he had been retained to evaluate the defendant and to provide his opinion as to whether the defendant was sane at the time of the alleged offenses and whether he would qualify for a guilty but mentally ill plea. Dr.

Cuneo asked for and reviewed the police reports and videotaped statements in preparation to interview and evaluate the defendant. He requested the defendant's educational records, but those records were unavailable. Dr. Cuneo also reviewed the defendant's clinical files at the jail and spoke with the jail's nursing staff about their interactions with the defendant. He evaluated the defendant at the St. Clair County jail on June 21, and 27, 2016. Dr. Cuneo diagnosed the defendant with six conditions after his evaluation and review of the records: (1) persistent depressive disorder, (2) mild intellectual disability, (3) past history of alcohol use disorder, (4) past history of cannabis use disorder, (5) past history of cocaine use disorder, and (6) borderline personality disorder.

¶ 16    Dr. Cuneo asked the defendant about his family and about his educational and work backgrounds. The defendant told him that his father was not involved with the family. Both his mother and father abused drugs. When he was 11 years old, the Department of Children and Family Services (DCFS) investigated his family. DCFS removed the defendant from his mother's home and first placed him in foster care, then in a group home, and finally with his grandmother. The defendant lived with his grandmother until he was 15 and then began moving between his grandmother's home and the homes of his friends. The defendant dropped out of school in the ninth grade because he was "tired of going to school." The defendant's income was derived from selling drugs.

¶ 17    In his evaluation of the defendant, Dr. Cuneo first conducted a mental status exam. He concluded that the defendant had no signs of psychosis, delusions, or schizophrenic thought pattern. Dr. Cuneo determined that the defendant was not experiencing psychosis because the defendant was oriented to person, place, time, and situation. The defendant informed Dr. Cuneo that he began hearing voices at some point in his life and tried to cut one of his wrists when he

6

was 18 because of the voices. He told Dr. Cuneo that the voices tell him that he is worthless and that he should kill himself. Dr. Cuneo explained that the "voices" in this case are not likely "auditory hallucinations" because the voices came from inside his head, whereas an individual experiencing auditory hallucinations would hear the voices from outside of his head. Dr. Cuneo also found that the defendant was not suffering from delusions. He defined delusions as a false belief system with no basis in reality. Dr. Cuneo determined that the defendant also did not have a schizophrenic thought pattern.

¶ 18    Dr. Cuneo concluded that the defendant suffered from persistent depressive disorder. He testified that the defendant's family background was consistent with depression because he never and any real sense of security or family life. Dr. Cuneo stated that the defendant's discussion of his depression was consistent and was not fabricated.

¶ 19    Dr. Cuneo also diagnosed the defendant with mild intellectual disability. During his evaluation, Dr. Cuneo observed that the defendant had a concrete or literal way of thinking as opposed to an abstract way of thinking, which likely meant that the defendant was either brain-damaged or intellectually limited. Additionally, Dr. Cuneo noted that the defendant was able to provide a simple history, but struggled with dates, and otherwise had mild memory impairment. Dr. Cuneo gave the defendant a Quick Test which measures a person's intelligence quotient (IQ). The defendant tested with an IQ of 60, which Dr. Cuneo testified placed him in the bottom 1% of the nation with the cognitive abilities at a 9- or 10-year-old level. Based upon this IQ score, Dr. Cuneo concluded that the defendant suffered from mild intellectual disability.

¶ 20    Based upon the background information provided by the defendant, Dr. Cuneo also diagnosed the defendant with past substance abuse disorders. The defendant had a history of substance abuse, including alcohol and marijuana. The defendant's marijuana usage ended at the

age of 28, and he began abusing crack cocaine at the age of 31 which continued until 2012—approximately 3 years before the alleged crimes in this case.

¶ 21 Dr. Cuneo finally diagnosed the defendant with borderline personality disorder. He based this diagnosis on additional information contained within assessments and reports prepared by a Dr. Kraushaar, who saw the defendant at the St. Clair County jail. These reports detailed a historical pattern of interpersonal difficulties the defendant had experienced with girlfriends/significant others. Dr. Kraushaar noted that the defendant's suicide attempt at the age of 18 was reportedly due to a break-up of a relationship. Dr. Cuneo testified that the defendant met three of the nine requirements to be diagnosed with borderline personality disorder. He described the disorder as "an enduring dysfunctional trait" and explained that individuals with this disorder are especially sensitive to rejection. These individuals tend to bounce back and forth in their relationships with love and hate. Dr. Cuneo testified about two of the three requirements the defendant appeared to exhibit. First, the defendant exhibited frantic efforts to avoid real or imagined abandonment, and second, he experienced a pattern of unstable and intense interpersonal relationships. Dr. Cuneo explained that the abandonment at issue could be either real or imagined.

¶ 22 Dr. Cuneo provided his opinion within a reasonable degree of psychological certainty that the defendant's diagnoses would satisfy the Illinois requirements for seeking a conviction of guilty but mentally ill. In support, he testified:

> "[M]y opinion is that he is limited intellectually. He's had bouts of depression all of his life. He is extremely sensitive to rejection or abandonment, real or imagined. Part of that is brought about by his brutal upbringing, his placement in DCFS care. *** [M]y belief was his mental illness was a major factor contributing to his actions."

¶ 23 However, Dr. Cuneo was also of the opinion that the defendant would not qualify for a finding of legal insanity that could excuse the defendant's criminal conduct. He explained that an

8

insanity defense would not work in this case because the defendant could appreciate the criminality of his actions. He found that the defendant was not psychotic or delusional and was not experiencing hallucinations.

¶ 24 In closing arguments, the State focused on the severity of the injuries and the defendant's acknowledgment that he had stabbed Sharetta. The State argued against the defendant's claim of unreasonable self-defense because he did not call the police or call for medical assistance after the incident. In response, the defense claimed that the defendant reacted with intense passion after being stabbed. The defense argued that although the defendant was not blameless, he was guilty but mentally ill of the murder and asked the court to reduce the charge based upon his unreasonable reaction to being stabbed.

¶ 25 The trial court found the defendant guilty but mentally ill of first degree murder and aggravated battery to a child, and found the defendant not guilty of attempted first degree murder. At sentencing, the State argued that the defendant acted with full knowledge and without remorse for his actions. In response, the defense argued that this was a tragic accident and not an act of revenge because the defendant was mentally ill, intellectually disabled, and had a history of substance abuse. The trial court announced its consideration of the factors in aggravation and mitigation. In mitigation, the court stated:

> "I have considered in mitigation, the fact that [the defendant] suffers from an intellectual disability, and also by virtue of my finding of guilty but mentally ill, that he was suffering from a serious mental illness at the time of this offense—of these offenses, but it was not sufficient to establish an affirmative defense."

The court sentenced the defendant to 40 years at 100% for the murder charge and 20 years at 85% for the aggravated battery to a child charge, to be followed by 3 years of mandatory supervised release. The sentences were to be served consecutively. The defendant timely appealed.

¶ 26                                  II. ANALYSIS

¶ 27    On appeal, the defendant raises two issues. First, he asks this court to reduce his

conviction from first degree murder to second degree murder because he claims that the evidence

showed, by a preponderance of the evidence, that he was reacting to being stabbed by Sharetta.

Second, he argues that his sentence is unconstitutional on three bases: (1) the trial court did not

properly consider the mitigating nature of his intellectual disability and his mental health

impairments at sentencing, (2) the sentence violates the proportionate penalties clause of the

Illinois Constitution (Ill. Const. 1970, art. I, § 11), and (3) the sentence violates the eighth

amendment of the United States Constitution (U.S. Const., amend. VIII).

¶ 28                   A. Reduction of Conviction to Second Degree Murder

¶ 29    We begin our analysis by reviewing the statutory language for second degree murder.

Section 9-2(a)(2) of the Code states in relevant part:

> "A person commits the offense of second degree murder when he or she commits the
> offense of first degree murder *** and ***:
>
>     ***
>
>     (2) at the time of the killing he or she believes the circumstances to be such that, if
>     they existed, would justify or exonerate the killing ***, but his or her belief is
>     unreasonable." 720 ILCS 5/9-2(a)(2) (West 2014).

Second degree murder is not appropriate if defendant is unable to establish a mitigating factor by

a preponderance of the evidence. *People v. Jeffries*, 164 Ill. 2d 104, 118 (1995).

¶ 30    We next review section 7-1 of the Code, which explains when a person is justified in the

use of force against another:

> "(a) A person is justified in the use of force against another when and to the extent
> that he reasonably believes that such conduct is necessary to defend himself or another
> against such other's imminent use of unlawful force. However, he is justified in the use
> of force which is intended or likely to cause death or great bodily harm only if he

                                          10

reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony.

(b) In no case shall any act involving the use of force justified under this Section give rise to any claim or liability brought by or on behalf of any person acting within the definition of 'aggressor' *** against the person or estate of the person using such justified force, unless the use of force involves willful or wanton misconduct." 720 ILCS 5/7-1(a) (West 2014).

The term "aggressor" is implicitly defined in section 7-4 of the Code in that the use of force by an aggressor is not available if that individual:

"[o]therwise initially provokes the use of force against himself, unless:

(1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

(2) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." *Id.* § 7-4(c).

¶ 31 Finally, we turn to *People v. Martinez*, 2019 IL App (2d) 170793, to outline the elements of a self-defense claim. Self-defense is an affirmative defense. *Id.* ¶ 85. If self-defense is raised by the defendant, then the State must prove all elements of the charged offense and must additionally prove that the defendant did not act in self-defense. *Id.* The State must prove that self-defense is inapplicable beyond a reasonable doubt. *Id.* The elements of self-defense are as follows:

"(1) unlawful force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the defendant subjectively believed a danger existed that required the use of the force applied, and (6) the defendant's belief was objectively reasonable." *Id.* (citing *People v. Lee*, 213 Ill. 2d 218, 225 (2004), and 720 ILCS 5/7-1 (West 2016)).

If the State negates one of the six self-defense elements, the defense fails. *Id.*

11

¶ 32    The defendant has the burden of proof by a preponderance of the evidence to establish that the mitigating factors for second degree murder were present. Here, the defendant only needs to prove the first five elements of self-defense because mitigation to second degree murder allows the defendant to have an unreasonable belief in the need for self-defense. See *People v. Thurman*, 223 Ill. App. 3d 196, 204 (1991); 720 ILCS 5/9-2(a)(2) (West 2014).

¶ 33    On appeal, we must view the evidence in the light most favorable to the State and determine if any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Martinez*, 2019 IL App (2d) 170793, ¶ 86. We must not substitute our judgment for that of the fact finder on any questions that involve witness credibility or weight of the evidence. *Id.*

¶ 34    In this case, the defendant does not dispute that the State proved that he was guilty of first degree murder beyond a reasonable doubt. However, the defendant contends that the facts of this case adequately established his claim of an unreasonable self-defense. In short, the defendant claims that because Sharetta initially cut him, he was appropriately defending himself by stabbing her back, although the circumstances did not warrant the extent of his defense. The State counters that a reduction of the defendant's conviction is inappropriate because the defendant is unable to establish three of the five self-defense elements.

¶ 35    First, we find that the defendant is unable to establish that he was not the initial aggressor. During his testimony at trial, the defendant acknowledged that Sharetta had asked him to leave her apartment several times on the day of the incident. She had accused him of "walking up" on her by following her into the bedroom. In her own defense, Sharetta retrieved a knife from her purse and told the defendant not to approach her. The defendant admits that he saw the knife in her hand and acknowledges that she told him not to approach her. However, because he

12

claims he was trying to show her his cell phone when he approached her, he seemingly argues that Sharetta could not have construed his actions as confrontational or threatening. While the defendant claims that Sharetta cut him first—a fact that was confirmed by the testimony of her son, N.D.—we find that Sharetta's actions were intended as a response to the defendant's refusal to leave and the defendant's behavior in approaching her after she told him not to do so.

¶ 36 Our conclusion that the defendant was the aggressor is based, in part, on the testimony of Sharetta's son, N.D. N.D.'s recollection of the events was different than that expressed by the defendant. N.D. testified that he heard his mother yelling, and when he ran back into the apartment, the defendant was holding her by the arm. Initially, the defendant made N.D. and his mother go into the bedroom where he threatened to kill them both and then dragged them back out into the living room. These events occurred before Sharetta struck the defendant with her knife. N.D. testified that he saw knives in both his mother's and the defendant's hands while in the bedroom. N.D. testified that, when they were almost back in the living room, he saw his mother cut the defendant with her knife.

¶ 37 While there is no question that Sharetta cut the defendant first, we find that the defendant's actions leading up to that point were sufficiently confrontational to negate his claim that he was not the initial aggressor. Through his aggressive behavior and alleged threats, it is logical that Sharetta could have viewed the defendant's actions as intimidating and combative. As we must view the evidence in the light most favorable to the State, we find that there was sufficient factual evidence that the defendant was the initial aggressor in this case, and that the trial judge, as the trier of fact, could have concluded that the defendant did not act in self-defense. *Martinez*, 2019 IL App (2d) 170793, ¶ 86.

13

¶ 38   Second, we find that the defendant is unable to establish that the danger of harm to him was imminent. The State cites to *United States v. Feather*, 768 F.3d 735, 739 (7th Cir. 2014), for its explanation of the meaning of an imminent threat in the context of self-defense. The court stated: "Imminence is an essential element for self-defense because the threatened harm may, in fact, be avoidable: '[I]f the threat is not imminent, a retreat or similar step avoids injury.' " *Id.* (quoting *United States v. Haynes*, 143 F.3d 1089, 1091 (7th Cir. 1998)). Here, the defendant was repeatedly asked to leave. Nothing in the defendant's testimony at trial or in his responses to investigating officers after the incident indicates that he had no alternative to stabbing Sharetta. The defendant could have backed out of Sharetta's bedroom and exited the apartment. Instead, by continuing to press Sharetta and approaching her, he escalated the confrontation. At trial, the defendant testified as follows:

> "A. When I was in the living room, she was in the bedroom. When I came into the bedroom, she had taken the knife out of her purse.
> Q. Is this the knife she carried?
> A. Yeah. That's the knife she keep in her purse all the time.
> Q. All right. She had the knife out. What was she saying?
> A. Alvin, don't walk up on me.
> * * *
> A. She pulled her knife out a little bit before when I got in the room."

While the defendant argues that the "imminent threat" from Sharetta is clear and obvious because she removed a knife from her purse, we find that the defendant was not in imminent danger because he had the ability to extricate himself from the situation. Instead, by pursuing Sharetta, the defendant became the aggressor.

¶ 39   We are mindful that the defendant suffered from mental illness and intellectual disabilities. The defendant asks this court to find that because of those limitations, he perceived that Sharetta posed an imminent threat to him that night. However, the trial judge heard the testimony of the defendant and N.D. about what transpired. Admittedly, N.D. was not there at

14

the beginning of the argument. When N.D. entered his apartment, he saw that the defendant was holding Sharetta by her arm. According to N.D., this was before Sharetta cut the defendant. Then, the defendant ordered N.D. and Sharetta to go to the bedroom where the defendant proceeded to threaten to kill them. Again, according to N.D., this was before Sharetta cut the defendant. N.D.'s testimony about the defendant's behavior at that time reflects that the defendant was being aggressive and threatening. As we must view the evidence in the light most favorable to the State, we find that the defendant is unable to positively establish that there was an imminent danger of harm. *Martinez*, 2019 IL App (2d) 170793, ¶ 86. We find that without a danger of imminent harm to the defendant, his self-defense claim fails.

¶ 40     Third, we find that the defendant is unable to establish that his use of force was necessary under the circumstances. At trial, the defendant testified that he was wrestling with Sharetta over the knife in her hand. N.D. testified that the defendant was trying to take the knife from his mother's hand. The defendant ultimately disarmed Sharetta and took control of her knife. At that point, any threat to the defendant's life ended. However, the defendant proceeded to stab Sharetta 12 times. Four of the wounds were identified by Dr. Pettuchak as being three inches deep, and all were classified as fatal because of the involvement with her lungs and heart.

¶ 41     While an individual may have a right to self-defense, that right cannot justify an act of retaliation and revenge, and furthermore, it does not allow the individual to pursue and inflict injury. See *People v. Belpedio*, 212 Ill. App. 3d 155, 161-63 (1991) (in an adult touch football game, where the victim received a pass from his quarterback and turned towards the end zone making contact with the defendant who was on defense for the opposing team, the defendant's subsequent aggravated battery to the victim was determined to be an act of retaliation and revenge, and if the victim had been the aggressor because of the initial contact with the

15

defendant or because of alleged subsequent elbowing or shoving, the defendant's responsive actions rendered him the protagonist and his claim of self-defense failed). Here, Sharetta repeatedly asked the defendant to leave her apartment and he refused to comply, the defendant disarmed Sharetta and took possession of her knife, and the defendant stabbed Sharetta 12 times. We find that the defendant's use of force was quite excessive and was consistent with retaliation and revenge instead of self-defense. Accordingly, we find that the defendant's claim of self-defense fails.

¶ 42    We find that the defendant was not able to establish unreasonable self-defense. The State established beyond a reasonable doubt that the defendant did not act in self-defense. The defendant could not disprove that he was the aggressor, that he was in imminent danger, or that his use of force against Sharetta was reasonable. We affirm the defendant's conviction of guilty but mentally ill of first degree murder.

¶ 43                                  B. Constitutionality of the Sentence

¶ 44    The defendant next contends that his 60-year prison sentence is unconstitutional because the trial court failed to properly consider the mitigating nature of his intellectual disability and mental health impairments. The defendant also argues that his sentence is unconstitutional as violative of the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the eighth amendment of the United States Constitution (U.S. Const., amend. VIII).

¶ 45    On appeal, we will not reverse a sentence unless the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). "[A] sentence within statutory limits will be deemed excessive [only if it is] manifestly disproportionate to the nature of the offense." *Id.* at 210. Our review of a sentence must be based upon each case's facts and circumstances. *People v. Fern*, 189 Ill. 2d 48, 53 (1999).

16

¶ 46    Illinois law mandates that sentences "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; 730 ILCS 5/1-1-2 (West 2014); *People v. Clemons*, 2012 IL 107821, ¶ 29. The trial court is required to balance the "retributive and rehabilitative purposes of punishment." *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990). All factors in aggravation and mitigation must be considered. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 47    Initially, we note that the sentences were within the statutory framework for the crimes of which the defendant was convicted. The defendant was sentenced to 20 years for aggravated battery to a child and 40 years for first degree murder, to be served consecutively. Aggravated battery of a child is a Class X felony, subject to a sentence of imprisonment of not less than 6 years and not more than 30 years. 720 ILCS 5/12-3.05(h) (West 2014); 730 ILCS 5/5-4.5-25 (West 2014). For first degree murder, the sentencing range is not less than 20 years and not more than 60 years. 730 ILCS 5/5-4.5-20(a) (West 2014). Consecutive sentences are mandatory when first degree murder or a Class X or Class 1 felony is one of the offenses and where the defendant "inflicted severe bodily injury." *Id.* § 5-8-4(d)(1).

¶ 48    In addition to the sentencing ranges, we also note that the trial court stated on the record that, "there are statutory factors in mitigation and aggravation, which I am required to consider, and that I have considered." As stated earlier in this order, the trial court specifically stated that the defendant's intellectual disability and his "serious" mental impairments were factors considered in mitigation. However, the court could not find that those mitigating factors were sufficient to establish an affirmative defense.

¶ 49    The sentences imposed in this case followed the statutory limits, and because the trial court considered all factors in mitigation and aggravation, it would be difficult to conclude that

17

the trial court abused its discretion in sentencing. *Stacey*, 193 Ill. 2d at 209-10. As stated earlier, when a sentence is within the statutory limits, that sentence can only be construed as excessive if the sentence is "manifestly disproportionate to the nature of the offense." *Id.* at 210. Given the brutal nature of Sharetta's murder, we conclude that the sentence is not disproportionate to the offense. *Id.* However, before we affirm the sentence, we must address the two constitutional issues raised by the defendant in this appeal.

¶ 50    The proportionate penalties clause of the Illinois Constitution provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Although the Illinois Constitution mandates that courts utilize both factors to determine the appropriate sentence, the Illinois Supreme Court has stated that " ' "there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense ***." ' " *People v. Coty*, 2020 IL 123972, ¶ 24 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 129 (2004), quoting *People v. Taylor*, 102 Ill. 2d 201, 206 (1984)). Factors that should be considered in " 'determining the seriousness of the offense include the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it.' " *Id.* (quoting *Huddleston*, 212 Ill. 2d at 129). In *Huddleston*, the Illinois Supreme Court stated that a sentence violates the proportionate penalties clause "if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." *Huddleston*, 212 Ill. 2d at 130. Additionally, a penalty is found to be violative of the proportionate penalties clause "where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely." (Internal quotation marks omitted.) *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Finally, the proportionate

18

penalties clause is violated if "offenses with identical elements are given different sentences." (Internal quotation marks omitted.) *Id.*

¶ 51     We review the *People v. Coty* orders and opinions that the defendant and the State cite in support of their respective positions. Here, after the defendant filed his brief on appeal citing to the appellate court opinion in *People v. Coty*, 2018 IL App (1st) 162383, the Illinois Supreme Court issued its opinion reversing the appellate court. *People v. Coty*, 2020 IL 123972. The defendant relies upon the most recent *Coty* appellate court opinion for his *de facto* life sentence argument. The defendant acknowledges that the Illinois Supreme Court reversed the appellate court but contends that the *Coty* case was fact driven and, therefore, we can still consider the defendant's proportionate penalties clause claim. The State argues that the Illinois Supreme Court's *Coty* opinion is dispositive.

¶ 52     The defendant in *People v. Coty* was intellectually disabled. *Coty*, 2020 IL 123972, ¶ 3. He had been convicted of predatory criminal sexual assault of a six-year-old child, and because that was his second conviction involving aggravated sexual assault of a child, he was sentenced to mandatory life in prison. *Id.* (citing 720 ILCS 5/12-14.1(b)(2) (West 2004)); *People v. Coty*, 388 Ill. App. 3d 1136 (2009) (table) (unpublished order under Supreme Court Rule 23). The defendant sought appellate review pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2004)), and the appellate court held that the mandatory life sentence, as applied, was unconstitutional under the proportionate penalties clause. *People v. Coty*, 2014 IL App (1st) 121799-U, ¶¶ 60-75. On remand, the defendant was then sentenced to a 50-year term of imprisonment. *Coty*, 2018 IL App (1st) 162383, ¶ 3. In the 2018 appellate opinion, the court vacated the *de facto* life sentence as violative of the proportionate penalties clause, stating:

> "[The] record does not establish that the trial court had a proper opportunity to consider, much less that it did consider, the attendant characteristics of the defendant's intellectual

19

disability and determined that the defendant was irretrievably depraved, permanently incorrigible, or irreparably corrupted beyond any possibility of rehabilitation so as to require a *de facto* life sentence." *Id.* ¶ 84.

With this decision, the Illinois Supreme Court concluded that the appellate court had extended the United States Supreme Court sentencing requirements of *Miller v. Alabama*, 567 U.S. 460 (2012), and *Atkins v. Virginia*, 536 U.S. 304 (2002), to adult offenders with intellectual disabilities.[1] *Coty*, 2020 IL 123972, ¶ 17. The State appealed, and the Illinois Supreme Court granted leave to appeal and reversed.

¶ 53    In *People v. Coty*, the Illinois Supreme Court concluded that given the unique facts of this case, a mandatory life sentence for predatory criminal sexual assault of a child based on a past conviction for the same offense did not violate the proportionate penalties clause even though the defendant was intellectually disabled. *Id.* ¶¶ 42, 44. The court held that the proportionate penalties clause was not violated by the mandatory life sentence for repeat child sex offenders (that had been held constitutional in *People v. Huddleston*) simply because the defendant was intellectually disabled. *Id.* ¶¶ 32, 42. In reaching this decision, the court considered the defendant's culpability, future dangerousness, and rehabilitative potential. *Id.*

¶ 54    In discussing the culpability factor, the supreme court reviewed and considered the characteristics of the intellectually disabled that the United States Supreme Court found in *Atkins* to be relevant to sentencing in capital punishment cases. *Id.* ¶ 33. However, the court prefaced its discussion of the factors noting that a mandatory life sentence was far different than capital punishment. *Id.* In *Atkins*, the Court determined that an intellectually disabled individual's culpability is lessened due to his diminished intellectual capacity: "to understand and process

---

[1]The United States Supreme Court held in *Miller v. Alabama* that a mandatory life sentence for a juvenile homicide offender is contrary to the eighth amendment prohibition against cruel and unusual punishment and is also an unconstitutionally disproportionate sentence. In *Atkins v. Virginia*, the United States Supreme Court set forth the characteristics of the intellectually disabled and held that those characteristics resulted in a reduced culpability barring a sentence of death.

information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318. In *Coty*, 2020 IL 123972, ¶ 35, the Illinois Supreme Court stated that in spite of these mitigating features of intellectual disability, the future dangerousness of an intellectually disabled adult is a factor to be considered in aggravation. The court stated that several of the *Atkins* factors as applied to the defendant are what made him a continuing danger to reoffend. *Id.* ¶ 36.

¶ 55 The court then turned to the second prong of the proportionate penalties clause and considered the prospect of the defendant's rehabilitation. *Id.* ¶ 37. Again, the court found that many of the *Atkins* factors "logically impair rehabilitative potential" and distinguished the defendant from a juvenile "whose mental development and maturation will eventually increase that [rehabilitative] potential, [while] the same cannot generally be said of the intellectually disabled over time." *Id.* Noting that intellectual impairment is "a permanent, relatively static condition," the supreme court stated that: "The enhanced prospect that, as the years go by and neurological development occurs, deficiencies will be reformed—is not a prospect that applies to this intellectually disabled defendant ***. The rehabilitative prospects of youth do not figure into the sentencing calculus for him." *Id.* ¶ 40.

¶ 56 The court concluded that in consideration of all relevant facts, including the defendant's prior convictions, a mandatory life sentence was not so " 'cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community.' " *Id.* ¶ 42 (quoting *Huddleston*, 212 Ill. 2d at 130). The court found that while the defendant may be less culpable because of his intellectual impairment, "the characteristics of his predominantly

21

static condition and his age make him less likely to be rehabilitated and thus more likely to reoffend." *Id.*

¶ 57    In this case, the defendant has an estimated IQ of 60, meaning that he has mild intellectual impairment. Reviewing the *Atkins* factors to be considered in analysis of the first prong of the proportionate penalties clause, there is no question that the defendant struggled "to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318. However, despite these intellectual difficulties, we cannot conclude that the defendant's 60-year sentence shocks the moral sense of the community. The defendant got into an argument with Sharetta about text communications. He threatened to kill Sharetta and her son. When Sharetta's then nine-year-old son, N.D., attempted to intervene in the struggle for Sharetta's knife, the defendant stabbed N.D. twice. In what was a brutal murder, the defendant stabbed Sharetta 12 times in retaliation for a superficial cut.

¶ 58    Turning to the second prong of the proportionate penalties clause, we examine the defendant's rehabilitative potential. Dr. Cuneo testified that the defendant struggled with rejection and abandonment issues in addition to his intellectual impairment. At sentencing, the court was informed that this was not the first time that the defendant had threatened a significant other with a knife. Eight years before Sharetta's murder, the defendant was married to Tia Harris. One night at about 1 a.m., Tia awoke, and the defendant was standing above her with a large kitchen knife. The defendant accused her of cheating on him. He struck his ex-wife several times and then sexually assaulted her. Police responded to the Harris home and arrested the defendant after Tia had been able to email a coworker and ask her to call the police because she was being held against her will. In addition to the defendant's history of violence with women in his life,

22

we must also consider the brutal nature of the defendant's actions that night. He stabbed Sharetta 12 times. He stabbed her son twice. He did not call the police or seek medical assistance for Sharetta and N.D. Instead, the defendant was concerned that the police would harm him because of what he had done. As the court in *Coty* stated, the *Atkins* factors, while certainly important to consider, can also serve to support a lengthy sentence. The defendant clearly had issues with reasoning, impulse control, and understanding the reactions of his girlfriend. As his intellectual disability is permanent, we find that the ability to mature is unlikely, and his rehabilitative potential is limited. See *Coty*, 2020 IL 123972, ¶¶ 37-40.

¶ 59 The defendant also claims that his 60-year sentence violated the eighth amendment of the United States Constitution because the sentence was cruel and unusual. "The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions." (Internal quotation marks omitted.) *Miller*, 567 U.S. at 469. The eighth amendment precludes life in prison without possibility of parole for juvenile offenders. *People v. Reyes*, 2016 IL 119271, ¶ 3. While the line drawn at the age of 18 may be imprecise as the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18," the United States Supreme Court drew that line because that "is the point where society draws the line for many purposes between childhood and adulthood." *Roper v. Simmons*, 543 U.S. 551, 574 (2005).

¶ 60 We cite to the supreme court's opinion in *Coty* on this eighth amendment issue as well. In rejecting the defendant's eighth amendment argument, the court stated:

"[I]f a sentence passes muster under the proportionate penalties clause, *i.e.*, it is found not to be 'cruel, degrading, or so wholly disproportionate to the offense committed as to *shock the moral sense of the community*,' after considering 'the seriousness of the offense *** with the objective of restoring the offender to useful citizenship' (emphasis added) [citation], then it would seem to comport with the contemporary standards of the eighth amendment ***." *Coty*, 2020 IL 123972, ¶ 45 (citing *People v. Horta*, 2016 IL App (2d)

23

140714, ¶ 62; *Huddleston*, 212 Ill. 2d at 129-30; and *Graham v. Florida*, 560 U.S. 48, 58 (2010)).

Furthermore, if the eighth amendment mandates a consideration of the " 'moral judgment' " and " 'mores' " of a wider national community, the Illinois Supreme Court noted that courts from all over this country have declined the opportunity to extend *Atkins* to noncapital cases or *Miller* to the intellectually disabled. *Id.* (quoting *Graham*, 560 U.S. at 58).

¶ 61    Considering the brutality of the crimes, we conclude that the defendant's 60-year sentence does not serve to shock the moral sense of the community. Accordingly, we find that the defendant's sentence is not in violation of the eighth amendment prohibition of cruel and unusual punishment.

¶ 62                                    III. CONCLUSION

¶ 63    For the reasons stated in this order, we affirm the conviction and sentence of the St. Clair County circuit court.

¶ 64    Affirmed.